879 F.2d 772
 58 USLW 2072, Fed. Sec. L. Rep. P 94,511
 W. David HOLLOWAY, M.D.; Lisa Holloway; Charles Woodard;
Linda Woodard; Maxine Black, individually and as Trustee
for James T. Black and Shellie Black; Porter-Strait
Instrument Co., Inc., an Oklahoma corporation; Jeremy K.
Bush; Shirley Bush; United Resources Building Company,
Inc., an Oklahoma corporation; Hugh Hollowell; Marshall H.
Udden; Mary F. Udden; Howard R. Cadwell; Doris G.
Cadwell; William L. Akers; Norita L. Akers; Cal Acree;
Betty K. Acree; Robert John Walpole; Bobbee C. Ray,
individually and as Trustee for James F. Haning, II and
Angela Jean Haning Revocable Trust and Victoria Nininger;
Joy A. Donovan, as Trustee for James M. Donovan and John A.
Donovan; R.H. Arnold; Marvelle McDaniel; Martha Hester
Arnold; Claudette Howe; Fred E. Miller; Vera Miller;
Beverly Joyce Miller; Ann McLoud; Joyce McClure;
Charlotte A. Broad, individually and as Trustee for Russell
M. Gawf and Megan D. Gawf; John E. Broad; John W. Broad;
DeWayne Broad, for themselves and as representative parties
of class, Plaintiffs/Appellees/Cross-Appellants,
v.
PEAT, MARWICK, MITCHELL & CO., a partnership; Sunbelt Bank
& Trust Company, formerly Republic Bank & Trust Co., a State
Bank Association; Wesley R. McKinney, individually;
Phillips Breckinridge, Administrator of the Estate of Glenn
F. Prichard, Deceased; RBI of Oklahoma, Inc., a Delaware
corporation; R.R. Bastian, III; Hal W. Oswalt; Harold J.
Born; William J. Doyle, Jr.; Horace H. Porter, M.D.;
William W. Ramsey; Edward B. Wilcox; Altus E. Wilder, III;
G. Larry Young; Orville J. Bertalot; Ted C. Bodley;
Keith E. McNeal; Edward L. Taylor; Charles G. Wray; Ansil
Ludwick, Jr.; Paul W. Anderson, Jr.; G. Richard Degen;
Brown J. Akin, Jr.; Robert C. Bates; Richard G. Bell; Bob
C. Lamirand; Douglas W. Dixon; Rodney Miller; Dan W.
Allred; Timothy J. Sullivan; Dwight A. Pilgram; Roger H.
Laubach; James D. Essig; Martha J. Cravens; Wilma F.
Wood; Charles Schusterman; Richard Williford; Republic
Bancorporation, Inc., also known as Sunbelt Bancorporation,
Inc., an Oklahoma corporation, Defendants/Appellants/Cross-Appellees.
 Nos. 87-1486, 87-1490.
 United States Court of Appeals,
Tenth Circuit.
 July 11, 1989.
 
 Lawrence H. Eiger (Michael B. Hyman and Steven A. Kanner, of Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Chicago, Ill., Steven E. Smith, of Steven E. Smith & Associates, Tulsa, Okl., Charles O. Hanson, Richard K. Holmes, and Stewart E. Field, of Hanson, Holmes, Field & Snider, of Tulsa, Okl., and Professor Joseph C. Long, of the University of Oklahoma, College of Law, Norman, Okl., with him on the briefs), of Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Chicago, Ill., for plaintiffs/appellees/cross-appellants.
 L.K. Smith (Kimberly A. Lambert, of Boone, Smith, Davis & Hurst, Tulsa, Okl., with him on the briefs), of Boone, Smith, Davis & Hurst, of Tulsa, Okl., for defendants/appellants/cross-appellees except Peat, Marwick, Mitchell & Co.
 Graydon Dean Luthey, Jr. (Deryl L. Gotcher and Roy C. Breedlove, of Jones, Givens, Gotcher, Bogan & Hilborne, a Professional Corporation, Tulsa, Okl., and Anthony J. Costantini, Associate Gen. Counsel, of Peat, Marwick, Main & Co., of New York City, with him on the briefs), of Jones, Givens, Gotcher, Bogan & Hilborne, a Professional Corp., Tulsa, Okl., for defendants/appellants/cross-appellees Peat, Marwick, Mitchell & Co.
 Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Rosalind C. Cohen, Asst. Gen. Counsel, and Batya Roth, Atty., of the S.E.C., Washington, D.C., amicus curiae.
 Before McKAY, BARRETT, and TACHA, Circuit Judges.
 TACHA, Circuit Judge.
 
 
 1
 The issue presented in this interlocutory appeal is whether certain instruments issued by three Oklahoma entities--Republic Bancorporation, Inc. (RBI), and its two nonbank subsidiaries, Republic Trust & Savings (RTS), a trust company, and Republic Financial Corporation (RFC), a finance company--are securities within the meaning of the federal securities laws. We hold that the instruments issued by RFC and RTS are securities. However, because material issues of fact remain regarding RBI's issuance of a note, we remand to the district court for further consideration of whether that note is a security. Therefore, we affirm in part, reverse in part, and remand.
 
 I.
 
 2
 Until 1984 RBI was a bank holding company regulated by the Federal Reserve Board (FRB). In addition to controlling RTS and RFC, RBI also controlled a state-chartered bank, Republic Bank & Trust Company (RBT). In 1984 RBI effectively divested RBT pursuant to an order from the FRB, thereby becoming a nonbank holding company that was outside the scope of federal banking regulation.[1] After divesting the bank, RBI continued to control RTS and RFC. Soon after the divestiture, RBI, RTS, and RFC all filed for bankruptcy.
 
 
 3
 The plaintiffs in this case invested money with RTS and RFC and received in return "thrift certificates" and "passbook savings certificates." In addition, RBI reissued to one of the plaintiffs a promissory note that had originally been issued by its subsidiary bank. The plaintiffs allege that through issuing these instruments, the issuing entities and their accounting firm sold, or aided and abetted the sale of, securities in violation of the antifraud provisions of the federal securities laws.
 
 
 4
 The defendants filed motions to dismiss, arguing that the instruments are not securities within the meaning of the federal securities laws and that therefore the district court lacked subject matter jurisdiction. The district court converted the motions to dismiss to motions for partial summary judgment on the issue of subject matter jurisdiction, and directed the parties to conduct discovery and submit briefs on the issue of government regulation of the three organizations.
 
 
 5
 After examining the regulatory structure applicable to each of the issuing entities and considering the broad definition of securities under the federal securities laws, the district court held that the instruments issued by RTS were not securities, but that those instruments issued by RFC, and the note issued by RBI, were securities. The court therefore granted the defendants' motion for summary judgment with respect to the RTS instruments and the plaintiffs' motion for summary judgment as to the RBI and RFC instruments. Both the plaintiffs and the defendants appealed.
 
 II.
 
 6
 When reviewing a grant of summary judgment, we must determine whether any genuine issue of material fact remains and, if not, whether the district court correctly applied the law. Franks v. Nimmo, 796 F.2d 1230, 1235 (10th Cir.1986). The district court correctly determined that only legal issues remain with regard to the instruments issued by RFC and RTS. Thus, we proceed to decide whether the court correctly determined whether those instruments, consisting of passbook savings certificates and thrift certificates, are securities. We employ a de novo standard of review for this question of law. See Carey v. United States Postal Serv., 812 F.2d 621, 623 (10th Cir.1987).
 
 
 7
 We first consider whether any of the instruments in question fall within the statutory definition of a security. The Securities Exchange Act of 1934 provides:
 
 
 8
 (a) Definitions
 
 
 9
 When used in this chapter, unless the context otherwise requires--
 
 
 10
 ....
 
 
 11
 (10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.
 
 
 12
 15 U.S.C. Sec. 78c(a)(10) (emphasis added). The definition of "security" in the Securities Act of 1933 is slightly different in that it also includes the term "evidence of indebtedness." See 15 U.S.C. Sec. 77b(1). Despite this difference, the Supreme Court has "consistently held that the definition of 'security' in the 1934 Act is essentially the same as the definition of 'security' in Sec. 2(1) of the Securities Act of 1933, 15 U.S.C. Sec. 77b(1)." Marine Bank v. Weaver, 455 U.S. 551, 555 n. 3, 102 S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409 (1982); see also United Hous. Found., Inc. v. Forman, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2057-58 n. 12, 44 L.Ed.2d 621 (1975) (definition of security in 1933 and 1934 Acts are "virtually identical").
 
 
 13
 When determining whether an instrument falls within the scope of the definitional statute, the Supreme Court has repeatedly stated that the definition of a security should be broadly construed because the federal securities laws are remedial legislation.[2] Id. at 847-48, 95 S.Ct. at 2057-2058; Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963); see also Marine Bank, 455 U.S. at 555-56, 102 S.Ct. at 1223.
 
 
 14
 In providing [the definition of a security] Congress did not attempt to articulate the relevant economic criteria for [distinguishing] "securities" from "non-securities." [R]ather, it sought to define "the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security."
 
 
 15
 Forman, 421 U.S. at 847-48, 95 S.Ct. at 2057-2058 (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess. 11 (1933)); see also Marine Bank, 455 U.S. at 555-56, 102 S.Ct. at 1223.
 
 
 16
 The remedial purpose that Congress intended to accomplish through the securities laws is the protection of investors:
 
 
 17
 The [1933 and 1934 Acts] were designed to provide investors with material information and to protect the investing public from the sale of worthless securities through misrepresentation. The legislation was intended to encourage "honest dealing in securities and thereby bring back public confidence" in the investment markets and to eliminate the "unethical and unsafe practices of bank and corporate officers."
 
 
 18
 Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 237 (2d Cir.1985) (citations omitted) (quoting Letter from President Franklin D. Roosevelt to Congress (March 29, 1933), reprinted in 77 Cong.Rec. 937 (1933)). The federal securities laws are designed "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." Capital Gains Research Bureau, 375 U.S. at 186, 84 S.Ct. at 279-80.
 
 
 19
 We apply the language of the definitional statutes to the instruments issued by RTS and RFC in light of the remedial purpose of the federal securities laws. The terms "passbook savings certificates" and "thrift certificates" do not expressly appear in either of the definitional statutes, but this does not prevent such instruments from being securities. We must consider the substance of the instrument rather than the form. Tcherepnin, 389 U.S. at 336, 88 S.Ct. at 553.
 
 
 20
 [I]f any inquiry other than whether the instrument fits the statutory definition is appropriate, it would be whether the instrument and transaction fit the traditional characteristics of the defined term, or whether ... the reasons and policies that gave rise to protection of securities under the 1933 and 1934 Acts are applicable.
 
 
 21
 Penturelli v. Spector, Cohen, Gadon & Rosen, 779 F.2d 160, 167 (3d Cir.1985) (citation omitted); accord Adena Exploration, Inc. v. Sylvan, 860 F.2d 1242, 1248 (5th Cir.1988).
 
 
 22
 Here, both the passbook savings certificates and thrift certificates are essentially debt instruments, representing a promise by the issuing entity to repay the principal amount, plus accrued interest at a specified rate, within a specified time period or on demand.[3] These instruments will therefore be analyzed under the "notes" or "evidence of indebtedness" categories of the statutory definition of "security."[4] See Sanderson v. Roethenmund, 682 F.Supp. 205, 206 (S.D.N.Y.1988) (holding that "international certificates of deposit" evidencing "a promise to pay a specified sum of principal and interest to the payee at a specified time" were to be analyzed as "notes" for purposes of the 1933 and 1934 Acts); cf. Bradford v. Moench, 670 F.Supp. 920, 922, 932-33 (D.Utah 1987) (noting that functional analysis of instruments must be applied to determine if "thrift certificates" or "saving passbook or other accounts" of state-chartered financial institution are securities).
 
 
 23
 Merely identifying these instruments as "notes" or "evidence of indebtedness" does not end our analysis, however, because the phrase "unless the context otherwise requires," precedes the definition of "security" in the statute itself. Thus, Congress has specifically directed an analysis that goes beyond the literal application of the definitional section.[5]
 
 
 24
 The Supreme Court has recognized two general circumstances in which the context of the underlying transaction could override the literal language of the statute. First, when the category utilized in the definitional statute is sufficiently ambiguous to raise the question whether Congress would have intended to include all such instruments on the basis of the face of the instrument alone, the Court permits an inquiry into the factual circumstances underlying the transaction. See Landreth, 471 U.S. at 693-94, 105 S.Ct. at 2305-06; see also Marine Bank, 455 U.S. at 556, 560 n. 11, 102 S.Ct. at 1223, 1225 n. 11. This inquiry involves "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 352-53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943); accord Marine Bank, 455 U.S. at 556, 102 S.Ct. at 1223; SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967).
 
 
 25
 Second, when the issuing entity is pervasively regulated by another federal regulatory scheme, the Court has inquired into whether such alternative federal regulation accomplishes the same purposes as the securities laws, thereby making the securities laws' protections for investors duplicative and unnecessary. See Marine Bank, 455 U.S. at 557-59, 102 S.Ct. at 1224-25; International Bhd. of Teamsters v. Daniel, 439 U.S. 551, 569-70, 99 S.Ct. 790, 801-02, 58 L.Ed.2d 808 (1979). Both of these "context" inquiries are potentially relevant to the instruments in this case, and we consider them in turn.
 
 A.
 
 26
 The "note" and "evidence of indebtedness" categories are sufficiently ambiguous to merit an inquiry into the factual context of the issuance of such instruments. See Zabriskie v. Lewis, 507 F.2d 546, 550-51 (10th Cir.1974); cf. Landreth, 471 U.S. at 693-94, 105 S.Ct. at 2305-06 (declaring that earlier statement by Court equating " 'notes' ... with 'stock' as categories ... standardized enough to rest on their names" was to be characterized as "dictum"). The term "note" is "viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context." Id., 471 U.S. at 694, 105 S.Ct. at 2306 (citing Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 137, 149-53, 104 S.Ct. 2979, 2985-88, 82 L.Ed.2d 107 (1984)).
 
 
 27
 Accordingly, the literal language of the 1934 Act--"[a security includes] any note ... but shall not include ... any note ... which has a maturity at the time of issuance of not exceeding nine months," 15 U.S.C. Sec. 78c(a)(10)--cannot be read literally to include or to exempt "any note" based on maturity alone. See Zabriskie, 507 F.2d at 550. In establishing the coverage of the securities laws, Congress neither intended to include all notes with maturities greater than nine months nor to exclude all notes with maturities less than nine months. See id. The exemption for short-term notes is limited to " 'prime quality negotiable [commercial] paper of a type not ordinarily purchased by the general public, that is, paper [issued] to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks.' " Id. (quoting Securities Act Release No. 4412, 26 Fed.Reg. 9158, 9159 (1961)); see also United States v. Roylance, 690 F.2d 164, 168-69 (10th Cir.1982).
 
 
 28
 The maturity of a note is therefore not dispositive. Instead, the commercial or investment character of the underlying transaction determines whether an instrument is a security.[T]he [1934] Act covers all investment notes, no matter how short their maturity, because they are not encompassed by the "any note" language of the exemption. On the other hand, the Act does not cover any commercial notes, no matter how long their maturity, because they fall outside the "any note" definition of a security.... [T]he investment or commercial nature of a note entirely controls the applicability of the Act, depriving of all utility the exemption based on maturity-length.
 
 
 29
 McClure v. First Nat'l Bank, 497 F.2d 490, 494-95 (5th Cir.1974) (emphasis in original), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); see Matek v. Murat, 862 F.2d 720, 727 n. 11 (9th Cir.1988) ("Especially in the area of commercial notes, a literal reading of the securities acts may not be appropriate."); Smith Int'l, Inc. v. Texas Commerce Bank, 844 F.2d 1193, 1199 n. 4 (5th Cir.1988) ("[I]t is simply too late in the day to successfully contend that the literal statutory definitions of themselves mean that it can always be reasonably argued that any note (or any for more than nine months) is a security no matter what the circumstances.") (emphasis in original).
 
 
 30
 This circuit has utilized the commercial/investment dichotomy in evaluating whether notes or similar debt instruments fall within the definition of security. See McVay v. Western Plains Serv. Corp., 823 F.2d 1395, 1399 (10th Cir.1987) (loan participations); McGovern Plaza Joint Venture v. First of Denver Mortgage Investors, 562 F.2d 645, 647 (10th Cir.1977) (loan commitments); Zabriskie, 507 F.2d at 551 (promissory notes). The commercial/investment test
 
 
 31
 is based on the purpose of the Act to protect investors, the "unless the context otherwise requires" language, and the practical considerations of subjecting commercial notes to the registration provisions of the Securities Act as well as fear of the resulting litigation flooding the federal courts if commercial notes were included. The test accords with the exalting of economic reality over form, and seeks to protect investors.
 
 
 32
 Id. (citation omitted).
 
 
 33
 In Zabriskie, the court cited with approval a number of factors that one commentator had suggested "could assist in the final determination that an investment note (a security) is or is not present." Id. at 551 n. 9. The factors include:
 
 
 34
 (1) use of proceeds to buy specific assets or services (commercial) rather than general financing (investment), (2) risk to initial investment, (3) giving certain rights to a payee (investment), (4) repayment contingent on profit or out of production (investment), (5) a large number of notes or payees (investment), (6) a large dollar amount (investment), (7) fixed time notes (equivocal) rather than demand notes (commercial), and (8) characterization by the parties themselves.
 
 
 35
 Id. Other federal courts have similarly utilized these factors. See Great W. Bank & Trust v. Kotz, 532 F.2d 1252, 1257-58 (9th Cir.1976); C.N.S. Enters. v. G. & G. Enters., 508 F.2d 1354, 1361-62 (7th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); McClure, 497 F.2d at 493 & n. 2. As we implicitly recognized in Zabriskie, 507 F.2d at 551-52, and as other courts have explicitly stated, "These criteria are helpful but each case appears to require its own decision based upon its own facts," C.N.S. Enters., 508 F.2d at 1362; see also Hunssinger v. Rockford Business Credits, Inc., 745 F.2d 484, 488 (7th Cir.1984); McClure, 497 F.2d at 493 n. 2. Not all factors, therefore, must point in the same direction in order for an instrument to be considered an investment.
 
 
 36
 Several factors are particularly important in this case. Foremost among them is the fact that RTS and RFC solicited the general public for investments in their passbook savings certificates and thrift certificates. After an extensive review of the cases in this area, the Fifth Circuit concluded that offering notes to a broad class of investors "usually indicated the investment overtones of the underlying transactions." Id. at 493-94; see also Hunssinger, 745 F.2d at 492 ("broad solicitation of members of the general public" and "sale to them of units of a larger offering are the hallmarks of an investment transaction"); Zabriskie, 507 F.2d at 551 n. 9 ("large dollar amount" and "large number of notes or payees" cited as factors indicating a security). We agree.
 
 
 37
 According to the complaint, these instruments were offered and sold in various denominations[6] to the general public and were purchased by more than 10,000 investors. In circumstances similar to this case, the Seventh Circuit rejected an argument by a broker-dealer that the antifraud provisions of the federal securities laws did not apply to instruments which it had offered for sale to the general public. Sanders v. John Nuveen & Co., 463 F.2d 1075, 1079-80 (7th Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). Nuveen, the broker-dealer, had purchased " 'short term open market' paper" issued by an entity "engaged in the business of making loans." Id. at 1079. The paper was offered to the general public and was bought by forty-two purchasers, most of whom invested less than $100,000. Id. at 1079 & n. 14. When the issuing entity became insolvent, the purchasers brought suit against Nuveen. The Seventh Circuit held in that case that under the "economic reality" of the transaction, "it is reasonably clear that plaintiff and his class purchased the kind of 'security' in regard to which the securities acts were intended to offer protection against fraud, misrepresentation and non-disclosure.... We believe Congress intended to protect against fraud the purchasers of securities such as those involved here...." Id. at 1079-80 (footnote omitted).
 
 
 38
 Although no broker was involved in this case, the court's reliance upon the public offering of notes in Sanders is persuasive here as well. The note holders in that case were certainly not commercial actors, such as banks, seeking to make commercial loans. They were investors seeking a passive return on their investment.
 
 
 39
 When a prospective borrower approaches a bank for a loan and gives his note in consideration for it, the bank has purchased commercial paper. But a person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment.
 
 
 40
 Id. at 1080, quoted in Zabriskie, 507 F.2d at 551; see also Hunssinger, 745 F.2d at 492 (notes sold to passive investors held to be securities).
 
 
 41
 Under the circumstances in this case, the public offering aspect of the transaction indicates that an investment transaction has transpired. The need to effectuate the purpose of the securities laws in protecting the "public from the sale of worthless securities through misrepresentation" is especially acute. Gary Plastic, 756 F.2d at 237. "In an investment situation, the issuer has superior access to and control of information material to the investment decision." Kotz, 532 F.2d at 1262 (Wright, J., concurring). The information advantage held by the issuer makes most investors dependent upon the honesty and goodwill of the issuer to disclose accurate, relevant information.
 
 
 42
 Commercial lenders, such as banks, are often able to overcome this information disadvantage.
 
 
 43
 While banks are subjected to risks of misinformation, their ability to verify representations and take supervisory and corrective actions places them in a significantly different posture than the investors sought to be protected through the securities acts.
 
 
 44
 ... Rather than relying solely on semi-anonymous and secondhand market information, as do most investors, the commercial bank deals "face-to-face" with the promissor. The bank has a superior bargaining position and can compel wide-ranging disclosures and verification of issues material to its decision on the loan application.
 
 
 45
 Id. at 1261-62 (Wright, J., concurring).
 
 
 46
 In contrast, the typical members of the general public responding to a public offering, such as the investors in this case, individually lack the practical ability to obtain such disclosures and verifications to insure a sound investment decision. Furthermore, without the capacity to obtain such information on an ongoing basis after they have committed capital to the enterprise, such investors also effectively lack the ability to monitor the financial condition of the issuing entity or to implement protective or supervisory controls to protect their investment.[7] Such investors must depend upon the honesty and goodwill of the issuing entity. The securities laws provide necessary protection for such investors when those affiliated with the issuing entity breach this trust. See Matek, 862 F.2d at 724-25 ("The securities acts protect those without inside access to information about an investment from overreaching or manipulation of their investments by insiders or promoters.").
 
 
 47
 Closely related to this protection rationale is the fact that here the instruments were issued as a vehicle for raising capital which was apparently used as general financing for RTS and RFC, and which involved the risk of total loss for the investors. This was not a secured lending transaction in which the creditor obtained collateral that would protect his investment in the event of default. Neither does the transaction appear to be a commercial unsecured loan in which the parties contemplated the risk and structured the agreement accordingly. See, e.g., Kotz, 532 F.2d at 1259.
 
 
 48
 The issuer's characterization of the instrument is also an appropriate consideration in determining whether a transaction is investment or commercial in nature. See Zabriskie, 507 F.2d at 551 n. 9. The record shows that at least some of the offering materials used to induce purchases of instruments issued by RTS and RFC referred to the contributions by investors as "investments," expressly disclaiming that they were "deposits." Furthermore, RFC filed prospectuses with the Oklahoma Securities Commission, characterizing the instruments it issued as "securities."[8] Although the name given is not dispositive, neither is it wholly irrelevant. Forman, 421 U.S. at 850, 95 S.Ct. at 2059. The use of these terms could have lead purchasers "justifiably to assume that the federal securities laws apply." Id.
 
 
 49
 We recognize that not all of the factors cited in Zabriskie point toward finding a security in this case. Repayment of the instruments issued by RFC and RTS is not contingent on profit or production as contemplated by the Zabriskie factors, except in the broad sense that failure of the institution as a result of long-term unprofitability defeats repayment. This factor, however, is somewhat unreliable because it would disqualify any note with a fixed rate of interest. Such a result would clearly be contrary to the purposes of the Acts. See Hunssinger, 745 F.2d at 490-91.
 
 
 50
 The Supreme Court's statements concerning application of the Howey test, which also contains a profits element, underscore the unreliability of this factor. The Howey test--"whether the [investment] scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others"--was articulated by the Supreme Court to determine whether a putative security is an "investment contract," one of the general terms in the definitional statute. SEC v. W.J. Howey Co., 328 U.S. 293, 298-99, 301, 66 S.Ct. 1100, 1102-03, 1104, 90 L.Ed. 1244 (1946). Although the Supreme Court has noted in dicta that the Howey test "embodies the essential attributes that run through all of the Court's decisions defining a security," Forman, 421 U.S. at 852, 95 S.Ct. at 2060, the Court has subsequently rejected the proposition that the Howey test is applicable to all securities:
 
 
 51
 [W]e would note that the Howey economic reality test was designed to determine whether a particular instrument is an "investment contract," not whether it fits within any of the examples listed in the statutory definition of "security." Our cases are consistent with this view. Moreover, applying the Howey test to traditional stock and all other types of instruments listed in the statutory definition would make the Acts' enumeration of many types of instruments superfluous.
 
 
 52
 Landreth, 471 U.S. at 691-92, 105 S.Ct. at 2304-05 (footnote and citations omitted) (emphasis in original).
 
 
 53
 At the time the Court was deciding Forman, it had not yet considered whether a debt instrument fell within the definitional statute. Hunssinger, 745 F.2d at 491; Exchange Nat'l Bank v. Touche Ross & Co., 544 F.2d 1126, 1136 (2d Cir.1976). In stating that the Howey test " 'embodies the essential attributes that run through all the Court's decisions defining a security,' " Hunssinger, 745 F.2d at 491 (quoting Forman, 421 U.S. at 852, 95 S.Ct. at 2060), the Court had "merely identified a characteristic of its past decisions, all of which involved an unusual instrument not easily placed within the ambit of the other terms enumerated in the definitional sections of the securities acts." Id.; see Landreth, 471 U.S. at 689 n. 4, 105 S.Ct. at 2303 n. 4.
 
 
 54
 The Supreme Court's interpretation of the profits element of the Howey test as including either "capital appreciation" or "participation in earnings," Forman, 421 U.S. at 852, 95 S.Ct. at 2060; see also Hunssinger, 745 F.2d at 490, also creates significant difficulties when applied to debt instruments because fixed interest payments do not fall within either of these definitions. Hunssinger, 745 F.2d at 489-90. Applying the profits element of the Howey test to every instrument would frustrate the intent of Congress by making superfluous several terms in the definitional statute, such as "bond," "note," and "debenture," all of which typically involve fixed interest payments. Id. 745 F.2d at 490-91. "[I]f the term 'profits' as used in [the Howey ] test were not to encompass fixed interest payments, then a twenty-year corporate bond issued in a public offering would not be a security." Id. at 491; see also Exchange Nat'l Bank, 544 F.2d at 1136 (Howey test of "dubious value" in note context). Furthermore, the Court's decision in Marine Bank, which was issued subsequent to Forman, indicates that some circumstances exist in which certificates of deposit, which typically involve fixed interest payments, can be securities. See Marine Bank, 455 U.S. at 560 n. 11, 102 S.Ct. at 1225 n. 11.
 
 
 55
 Thus, the fact that repayment is not strictly contingent on profits is not dispositive in this case. Because we analyze the instruments here as "notes" or "evidences of indebtedness," we need not also determine whether they are "investment contracts" under Howey.[9]
 
 
 56
 Similarly, the demand character of the passbook savings certificates is not dispositive. Although there is authority for the proposition that "a demand or short-term note is almost ipso facto not a security unless payment is dependent upon the success of a risky enterprise, or the parties contemplate indefinite extension of the note or perhaps conversion to stock," Kotz, 532 F.2d at 1257-58 (emphasis added), we refuse to make a talisman of this factor. As discussed above, the maturity of a note does not determine its commercial or investment character. McClure, 497 F.2d at 495; SEC v. Continental Commodities Corp., 497 F.2d 516, 524-25 (5th Cir.1974). We doubt that Congress intended to allow the issuing entity to circumvent the securities laws solely through utilizing a short-term or demand maturity. See SEC v. American Bd. of Trade, Inc., 751 F.2d 529, 539-40 (2d Cir.1984).
 
 
 57
 Considering all of the relevant factors, we conclude that the passbook savings certificates and thrift certificates issued by RFC and RTS are investment, rather than commercial, instruments. The "context" of the factual circumstances underlying the issuance of these instruments does not require that they be excepted from the scope of the definitional statutes.
 
 B.
 
 58
 Even if the instruments here potentially qualify as securities because of the factual circumstances underlying the transactions, the context of other federal regulation may still remove these instruments from the federal securities laws. See Marine Bank, 455 U.S. at 557-59, 102 S.Ct. at 1224-25; Daniel, 439 U.S. at 569-70, 99 S.Ct. at 801-802. RFC and RTS have been subject to both federal and state regulation by various banking and regulatory agencies. Thus, we must consider whether the purposes of the federal securities laws have been effectuated by the regulatory schemes applicable to RFC and RTS.
 
 
 59
 In Marine Bank the Supreme Court addressed the scope of protection afforded by the securities laws in the context of a regulated environment. The Court considered whether a certificate of deposit issued by a federally regulated bank fell within the scope of the securities laws, ultimately holding that it did not. Marine Bank, 455 U.S. at 559, 102 S.Ct. at 1225. The Court relied upon the policy of providing protection for investors in deciding that question, stating that
 
 
 60
 [t]he definition of "security" in the 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires. It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws.
 
 
 61
 Id. at 558-59, 102 S.Ct. at 1224-25 (emphasis added). In the Court's view, such a bank certificate of deposit differed significantly from other long-term debt obligations because
 
 
 62
 [t]his certificate of deposit was issued by a federally regulated bank which is subject to the comprehensive set of regulations governing the banking industry. Deposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws; advertising relating to the interest paid on deposits is also regulated. In addition, deposits are insured by the Federal Deposit Insurance Corporation.
 
 
 63
 Id. at 558, 102 S.Ct. at 1224 (emphasis added) (footnotes omitted). The Court stated that "appropriate weight" must be given to "the important fact that the purchaser of a certificate of deposit is virtually guaranteed payment in full, whereas the holder of an ordinary longterm debt obligation assumes the risk of the borrower's insolvency." Id. (emphasis added).
 
 
 64
 The Court held that the certificate of deposit issued by the federally regulated bank in that case was not a security because of the presence of comprehensive regulation of the banking industry that "abundantly protected" the holders of such certificates of deposit. Id. at 559, 102 S.Ct. at 1225. The Court left open the possibility, however, that in some circumstances a certificate of deposit could be a security, which would entitle the holder to the protection of the securities laws.
 
 
 65
 It does not follow that a certificate of deposit or business agreement between transacting parties invariably falls outside the definition of a "security" as defined by the federal statutes. Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.
 
 
 66
 Id. at 560 n. 11, 102 S.Ct. at 1225 n. 11;[10] see also Bradford, 670 F.Supp. at 933 n. 24 (stating that Court's reference to business agreement between transacting parties "could include a passbook type of arrangement").
 
 
 67
 Likewise, in Daniel, the Supreme Court rejected a claim that certain pension plans are securities, 439 U.S. at 559, 566, 99 S.Ct. at 796, 799-800, noting that "the enactment of ERISA ... put the matter to rest," id. at 569, 99 S.Ct. at 801. "The existence of this comprehensive legislation governing the use and terms of employee pension plans severely undercuts all arguments for extending the Securities Acts to noncontributory, compulsory pension plans. Congress believed that it was filling a regulatory void when it enacted ERISA...." Id. at 569-70, 99 S.Ct. at 801-02. In addition, the Court noted that in light of ERISA, extension of the federal securities laws into this area serves no general purpose. Id. at 570, 99 S.Ct. at 802. The Court stated that "[w]hatever benefits employees might derive from the effect of the Securities Acts are now provided in more definite form through ERISA." Id.
 
 
 68
 The crucial factor present in both of these decisions is the "context" of comprehensive federal regulation providing sufficient protection to the holders of such instruments to make unnecessary the protection of the federal securities laws. The Supreme Court was careful to note that comprehensive federal regulation was the basis of both Marine Bank and Daniel. See Marine Bank, 455 U.S. at 558 & n. 7, 102 S.Ct. at 1224 & n. 7. We interpret Marine Bank in light of the supremacy clause to exclude the possibility that the "context" of state regulation is sufficient to displace the federal securities laws. A more expansive reading of the "context" clause would permit states to create their own exemptions to federal securities law coverage, which Congress clearly did not intend.
 
 
 69
 When Congress has created a comprehensive system of regulation applicable to securities, and important remedies based upon that system exist under federal law, the normal operation of the supremacy clause does not permit state regulation to preempt federal law. See SEC v. National Sec., Inc., 393 U.S. 453, 463, 89 S.Ct. 564, 570, 21 L.Ed.2d 668 (1969). Unless Congress specifically acts to reserve the regulation of securities to the states, the "paramount federal interest in protecting shareholders," id., under the securities laws mandates that federal remedies be available for investors. Otherwise, we would "emasculate the securities laws by forbidding remedies which might prove to be essential." Id.
 
 
 70
 Congress clearly has the power to create an exemption from the securities laws or to reserve some regulatory powers exclusively to the states. See, e.g., 15 U.S.C. Secs. 77c, 77d (exempting certain instruments or transactions); id. Sec. 77r-1 (permitting state to preempt application of section 77r-1(a) by adopting more restrictive statute). As a general rule, however, Congress has provided for concurrent regulation of securities by both the federal government and the states. Id. Secs. 77r, 78bb(a).
 
 
 71
 The Supreme Court's discussion in SEC v. Variable Annuity Life Insurance Co. of America, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), is instructive on Congress' intent in permitting concurrent securities regulation. At issue was whether "variable annuity" contracts, which had developed after Congress passed the exempting statute, were within the scope of the statutory exemption for any "insurance policy" or "annuity contract" that "was subject to the supervision of the state 'insurance commissioner, bank commissioner, or any agency or officer performing like functions.' " Id. at 73-74, 79 S.Ct. at 622-23 (Brennan, J., concurring) (quoting 15 U.S.C. Sec. 77c(a)(8)). The Court held that the meaning of the terms of the federal statute was a federal question. Id. at 69, 79 S.Ct. at 620. The state regulators' decisions regarding the definition of insurance or of annuity were "not decisive." Id. Justice Brennan's concurring opinion explains why this is so:
 
 
 72
 [H]owever adequately State Securities Commissioners might regulate an investment, it was not for that reason to be freed from federal regulation. Concurrent regulation, then, was contemplated by the Acts as a quite generally prevailing matter. [It is not] rational to assume that Congress thought that any business whatsoever regulated by a specific class of officials, [such as] the State Insurance Commissioners, would be for that reason so perfectly conducted and regulated that all the protections of the Federal Acts would be unnecessary. This approach of personally selective deference to the state administrators is hardly to be attributed to Congress.
 
 
 73
 Id. at 75, 79 S.Ct. at 624 (Brennan, J., concurring) (emphasis in original).
 
 
 74
 Accordingly, we find nothing in the securities acts to indicate that Congress intended the states to displace the protections of the federal securities laws in this case. Congress has not exercised its power to suspend "the normal operations of the Supremacy Clause" by permitting the states to have paramount regulatory power. See National Sec., 393 U.S. at 463, 89 S.Ct. at 570. On the contrary, the statutes direct that "state regulation may co-exist with that offered under the federal securities laws," id. at 461, 89 S.Ct. at 569 (citing 15 U.S.C. Secs. 77r, 78bb(a)), and that nothing in the statutes "shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions [of the federal securities laws]," 15 U.S.C. Sec. 78bb(a) (emphasis added). The displacement of federal law through state regulation is therefore fundamentally inconsistent with the coexistence directed by Congress. Without specific direction to the contrary from Congress, the federal courts do not have the power to trump the paramount federal interest in protecting investors by creating additional exemptions to securities law coverage through the "context" of state regulation.[11] See National Sec., 393 U.S. at 468, 89 S.Ct. at 572.
 
 
 75
 The interpretation of the interrelationship among the securities acts and other federal regulatory schemes promulgated by Congress, however, is clearly within the power of the federal courts, as the Supreme Court demonstrated in Marine Bank. We must therefore examine whether federal banking regulation applicable to RFC, RTS, and RBI is sufficient to satisfy the standard set forth in Marine Bank--whether the context of federal regulation abundantly protects investors, thereby making the protections of the federal securities laws unnecessary. See Marine Bank, 455 U.S. at 558-59, 102 S.Ct. at 1224-25.
 
 
 76
 As discussed above, an important purpose of the federal securities laws is to protect investors "from the sale of worthless securities through misrepresentation." Gary Plastic, 756 F.2d at 237. Although information disclosure provisions contribute significantly toward providing this protection, see SEC v. Ralston Purina Co., 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953), private remedies have also grown to play an important part of the protections afforded by federal law, see J.I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964); see also Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975). We interpret Marine Bank to permit other federal regulation to displace the federal securities laws only through fulfilling the disclosure and remedial purposes of the securities laws by alternate means.
 
 
 77
 In the context of federal regulation of banks, the regulators may satisfy the standard required by Marine Bank through exercising certain powers on behalf of investors. In order to give substance to the information disclosure purposes of the securities laws, the regulators must possess investigative powers to verify information proffered by the issuer, to compel disclosure of information that is material to the initial investment decision, and to monitor the ongoing financial condition of the regulated entity. See Marine Bank, 455 U.S. at 558 & n. 8, 102 S.Ct. at 1224 & n. 8 (noting reporting and inspection requirements and advertising regulations applicable to banks under federal law). Further, substantive limitations upon the lending and investment activities of banks also protect depositors. See id. (noting reserve requirements). Therefore, in lieu of full disclosure to investors of relevant, accurate information upon which to base an investment decision, investors are protected by another entity that acts on their behalf to monitor the issuing entity and to take corrective actions to protect their investments. The dependence upon this monitoring function is especially appropriate in an industry such as banking due to the confidential, nonpublic nature of many of the lending and investment activities of financial institutions.
 
 
 78
 The statutory framework of the federal securities laws also provides meaningful remedies for investors when the antifraud provisions of the laws have been violated. For example, section 10(b) of the 1934 Act, 15 U.S.C. Sec. 78j(b), and SEC rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5 (1988), have been interpreted to authorize private damage actions for an investor to recover from any person who makes untrue statements of material facts, or otherwise engages in any act to defraud in connection with the purchase or sale of a security. See Gilbert v. Nixon, 429 F.2d 348, 355 (10th Cir.1970). See generally T. Hazen, The Law of Securities Regulation Sec. 13.2 (1985). Thus, the purposes of the federal securities acts cannot be effectively carried out unless the alternate federal regulation provides for a meaningful remedy to investors. In Marine Bank the Supreme Court implicitly recognized the importance of meaningful remedies when it found "abundant protection" in part because of the "virtual guarantee of repayment in full." Marine Bank, 455 U.S. at 558-59, 102 S.Ct. at 1224-25. The presence of federal deposit insurance that had historically fully repaid holders of the type of instruments at issue in Marine Bank was evidence of a remedy analogous to that provided to individual investors under the federal securities laws. See id.
 
 
 79
 With this background in mind, we turn to analyze the regulatory structure applicable in this case. At the outset, we note that this analysis must be divided into two time periods--before and after RBI divested its bank subsidiary. During the time that RBI was a bank holding company, RBI and all of its subsidiaries, including nonbank subsidiaries such as RTS and RFC, were subject to some degree of federal regulation. After RBI divested RBT (its bank subsidiary), RBI was no longer a bank holding company because it held only nonbank subsidiaries. Therefore, RBI and its subsidiaries were no longer federally regulated under the Bank Holding Company Act of 1956 (BHCA), 12 U.S.C. Secs. 1841-1850, 1971-1978.[12] Only state regulation by the Oklahoma Banking Department and the Oklahoma Securities Commission remained in effect.
 
 
 80
 Based upon our holding that only federal regulation may be considered in the "context" analysis, no amount of state regulation is sufficient to satisfy the Marine Bank standard. Any instruments issued after divestiture of the bank, therefore, are not excluded from the definition of a security by virtue of the "context" of regulation. The district court erred in considering state regulation in its "context" analysis, and we therefore reverse the district court's holding that state regulation of RTS through the Oklahoma Banking Department satisfied Marine Bank and that the instruments issued by RTS were not securities on that account. Similarly, although the district court improperly considered state regulation of RTS by the Oklahoma Securities Commission, we nevertheless affirm the result that such regulation was insufficient to satisfy Marine Bank.
 
 
 81
 With regard to the instruments issued prior to divestiture, the district court considered both federal and state regulation of RFC, RBI, and RTS. Although the district court erred in considering the state regulation, we affirm the district court's holding that the federal regulation applicable to the issuing entities in this case was insufficient to satisfy Marine Bank.
 
 
 82
 Prior to divesting RBT, RBI was a bank holding company, and its subsidiaries RFC and RTS were therefore subject to federal regulation under the BHCA. The FRB is the regulatory body charged with administering the BHCA and the related regulations. The primary purpose of the FRB's administration of the BHCA, however, is to protect the stability and financial viability of subsidiary banks held by the holding companies. The FRB has stated its policy in regulating the corporate practices of bank holding companies:
 
 
 83
 (a) Bank holding company policy and operations. (1) A bank holding company shall serve as a source of financial and managerial strength to its subsidiary banks and shall not con[d]uct its operations in an unsafe or unsound manner.
 
 
 84
 (2) Whenever the Board believes an activity of a bank holding company or control of a nonbank subsidiary (other than a nonbank subsidiary of a bank) constitutes a serious risk to the financial safety, soundness, or stability of a subsidiary bank of the bank holding company and is inconsistent with sound banking principles or the purposes of the BHC Act or the Financial Institutions Supervisory Act of 1966, as amended (12 U.S.C. 1818(b) et seq.), the Board may require the bank holding company to terminate the activity or to terminate control of the subsidiary, as provided in section 5(e) of the BHC Act.
 
 
 85
 12 C.F.R. Sec. 225.4(a) (1988). Thus, if the holding company or its nonbank subsidiaries engage in activities that threaten the financial stability of the bank, the FRB has the power under the BHCA to order divestiture of nonbank entities, thereby protecting the bank's depositors.
 
 
 86
 The district court found that such federal regulation here did not "abundantly protect" the investors because it was aimed at protecting the bank's depositors, not investors in the bank holding company and the nonbank subsidiaries. We agree.
 
 
 87
 The protection afforded the investors in RTS and RFC as a result of federal regulation of RBI's nonbank subsidiaries was merely incidental to the protection of the bank's depositors. Although the investors in the nonbank entities benefited from the regulatory protection of the bank's depositors, their protection was dependent upon the coincidence of their interests with those of the bank's depositors. The nonbank investors' protection could disappear at any time, as demonstrated by the FRB's directive to RBI to divest the bank, leaving them exposed to substantial risk of loss, without a substantive remedy other than a claim in the assets of the insolvent company. This result is in direct contrast to the securities laws, which would provide continuous protection for such investors, and which provide potential remedies through the antifraud provisions. The investors in the nonbank subsidiaries also did not enjoy access to the important remedial benefit of federal deposit insurance, which Marine Bank determined to be an important part of the "virtual guarantee" necessary to displace the protection of the securities laws.
 
 
 88
 The indirect and potentially nonexistent protection provided by federal regulation in this case does not approach the level of "abundant protection" mandated by Marine Bank. Therefore, the "context" of federal regulation of RBI and its nonbank subsidiaries, RFC and RTS, prior to RBI's divestiture of its bank subsidiary, was insufficient to exclude from the definition of a security any instruments issued by RFC and RTS prior to divestiture.
 
 C.
 
 89
 In sum, "[u]nlike Marine Bank, federal securities fraud protection in this case is not a double-coating." Gary Plastic, 756 F.2d at 241. Rather, "absent the securities laws," the plaintiffs here did not have the abundant "protection against fraud and misrepresentation by the defendants in the marketplace" that is required by Marine Bank. Id. After considering the context of the underlying transactions, including the context of federal regulation, we conclude that the instruments issued by RTS and RFC are securities for the purposes of the federal securities laws.
 
 III.
 
 90
 With regard to the note issued by RBI, we conclude that certain material facts necessary to decide whether it falls within the scope of the definitional statute are not established in the record. The only evidence submitted by the plaintiff on this issue is the note itself. The face of the note does not convey the context under which the note was issued, including whether the parties negotiated the terms specifically for this transaction, as opposed to an offer at fixed terms to the general public, and whether Cal Acree, the putative investor, was in the business of commercial lending. Cf. Mace Neufeld Prods., Inc. v. Orion Pictures Corp., 860 F.2d 944, 946 (9th Cir.1988) ("single unique agreement, 'negotiated one-on-one' between two parties," and not designed to be publicly offered or traded not "a security" (quoting Marine Bank, 455 U.S. at 559, 102 S.Ct. at 1225)). Therefore, we reverse the summary judgment award in favor of the plaintiff as to the RBI note and remand for consideration of the context of the underlying transaction consistent with this opinion.
 
 IV.
 
 91
 We reverse the summary judgment in favor of the defendants as to the RTS instruments and remand to enter summary judgment in favor of the plaintiffs. We affirm the grant of summary judgment for the plaintiffs as to the RFC instruments. We reverse the summary judgment in favor of the plaintiff as to the RBI note and remand for further consideration.
 
 
 92
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 This account of the divestiture has been somewhat simplified. The actual details are set forth in In re Republic Trust & Savings Co., 59 B.R. 606, 607-08 (Bankr.N.D.Okla.1986), appeal denied, In re Republic Financial Corp., 77 B.R. 282 (N.D.Okla.1987). In 1984 RBI (old RBI) changed its name to Sunbelt Bancorporation, Inc., while a separate entity at that time known as Sunbelt Bancorporation, Inc. changed its name to Republic Bancorporation, Inc. (new RBI). Id. at 608. Old RBI transferred RTS and RFC to new RBI, while retaining ownership of the state-chartered bank. Id. "Neither old RBI nor new RBI held any significant ownership interest in each other." Id. For the purposes of this opinion, "RBI" simply refers at all times to the corporate parent of RTS and RFC
 
 
 [2]
 At least one commentator has remarked upon the broad interpretation of the securities laws by way of listing examples:
 What do the following have in common: scotch whiskey, self-improvement courses, cosmetics, earthworms, beavers, muskrats, rabbits, chinchillas, fishing boats, vacuum cleaners, cemetery lots, and fruit trees? The answer is that they have all been held to be securities within the meaning of federal or state securities statutes. T. Hazen, The Law of Securities Regulation Sec. 1.5, at 14 (1985) (footnotes omitted).
 
 
 [3]
 Both RFC and RTS reserved the right to subject holders of passbook savings certificates and thrift certificates to additional conditions upon demand for repayment: 1) thirty days written notice could be required prior to redemption; and 2) redemptions of certificates in any given calendar month could be limited to fifty percent of the net cash flow of the preceding month
 
 
 [4]
 Although federal law clearly governs whether such instruments are securities, see Tcherepnin, 389 U.S. at 337-38, 88 S.Ct. at 553-54, our characterization of these instruments is also consistent with Oklahoma law, which permits a trust company, such as RTS, "[t]o issue debentures, notes, or other evidences of debt in the manner in which business corporations are authorized to do so." Okla.Stat.Ann. tit. 6, Sec. 1001(A)(22) (West 1984). The instruments issued by RTS were not certificates of deposit, but certificates of indebtedness because RTS was not a bank and therefore lacked the power to accept deposits. In re Republic Trust & Sav. Co., 59 B.R. 606, 612-13 (Bankr.N.D.Okla.1986), appeal denied, In re Republic Fin. Corp., 77 B.R. 282 (N.D.Okla.1987). We see no reason to treat the instruments issued by RFC, a finance company, any differently as it also is a nonbank institution under Oklahoma law. See In re Republic Fin. Corp., 77 B.R. 282, 284 (N.D.Okla.1987)
 
 
 [5]
 Two circuit courts have held that the "context" language prefacing the definitional provisions of the 1933 and 1934 Acts refers only to the context in which a definitional term appears within the statute, and not to the context of the underlying transaction. See American Bankers Ass'n v. SEC, 804 F.2d 739, 753-54 (D.C.Cir.1986); Ruefenacht v. O'Halloran, 737 F.2d 320, 330-32 (3d Cir.1984), aff'd sub nom. Gould v. Ruefenacht, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985)
 The Supreme Court has not yet explicitly rejected this position, but it certainly has inquired beyond the four corners of the statute in determining whether a particular financial instrument is a security. See Marine Bank v. Weaver, 455 U.S. 551, 556-59, 102 S.Ct. 1220, 1223-25, 71 L.Ed.2d 409 (1982) (relying in part upon the "context" of federal regulation of banks in holding that certificates of deposit were not securities). Subsequent to Marine Bank the Court has continued to inquire into the "context" of the underlying transaction. See Landreth Timber Co. v. Landreth, 471 U.S. 681, 687, 105 S.Ct. 2297, 2302, 85 L.Ed.2d 692 (1985) ("context of the transaction involved here--the sale of stock in a corporation--is typical of the kind of context to which the [securities] Acts normally apply"). Although the Court held in Landreth that an inquiry into "the economic reality underlying the transactions" was not necessary in all cases involving the sale of "stock," id. at 690-91, 105 S.Ct. at 2304-05, it expressly left open the question "whether coverage of notes or other instruments may be provable" on the basis of their name and characteristics alone, id. at 693, 694, 105 S.Ct. at 2305, 2306. The Court explicitly stated that " 'stock' may be viewed as being in a category by itself for purposes of interpreting the scope of the Acts' definition of 'security.' " Id. at 694, 105 S.Ct. at 2306. Furthermore, the Court specifically noted that " 'note' may now be viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context." Id.
 The circuit courts in American Bankers Association and O'Halloran suggested that reliance upon the "context" clause was unnecessary to the Court's holding in Marine Bank because the legislative history and structure of the securities acts also supported the result. American Bankers Ass'n, 804 F.2d at 753-54 & n. 23; O'Halloran, 737 F.2d at 331 n. 29. Although we agree that the context of the underlying transaction cannot be used to contradict the intent of Congress as contained in the legislative history and structure of the Acts, we do not interpret Landreth or Marine Bank to restrict the scope of our consideration in this case to the statutory text or legislative history alone.
 
 
 [6]
 The complaint specifies the named plaintiffs' purchases of instruments in denominations ranging from approximately $100 to $100,000, with most purchases falling in the $1500 to $10,000 range
 
 
 [7]
 Although a regulatory agency may intervene on behalf of such investors, the proper focus in making the initial determination whether a transaction is commercial or investment in character is upon the primary actors directly involved in the transaction
 
 
 [8]
 Instruments offered or sold to the general public on the representation that they are an attractive investment are generally deemed to be securities. As the Supreme Court has emphasized, courts should consider " 'the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as [the Securities Act] it is not inappropriate that promoters' offerings be judged as being what they were represented to be.' " SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967) (quoting SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 352-53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943))
 
 
 [9]
 We note that the Eighth Circuit has held that demand notes issued by a farmers' cooperative to its members must satisfy the Howey test to qualify as securities under the federal securities laws. Arthur Young & Co. v. Reves, 856 F.2d 52, 54 (8th Cir.1988), cert. granted, --- U.S. ----, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989). The Seventh Circuit has recently followed Reves by similarly utilizing the Howey test. See Schlifke v. Seafirst Corp., 866 F.2d 935, 941-42 (7th Cir.1989). For the reasons discussed above, we reject this analysis
 
 
 [10]
 Although the definition of a security in the 1933 and 1934 Acts was amended after Marine Bank to include options on certificates of deposits, the legislative history is explicit that no change in the current law regarding the treatment of certificates of deposit was intended. H.Rep. No. 626, pt. I, 97th Cong., 2d Sess. 10, reprinted in 1982 U.S.Code Cong. & Admin.News 2780, 2788
 
 
 [11]
 The Ninth Circuit has held that a certificate of deposit issued by a Mexican bank was not a security. Wolf v. Banco Nacional de Mexico, S.A., 739 F.2d 1458, 1463-64 (9th Cir.1984), cert. denied, 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985); accord West v. Multibanco Comermex, S.A., 807 F.2d 820, 827 (9th Cir.), cert. denied, 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987). In Wolf "it was conceded that the Mexican government's regulation of [the bank] provides its certificate holders the same degree of protection against insolvency as does the federal system in this country." Wolf, 739 F.2d at 1463 (emphasis added). Although the decision in Wolf denied recourse to investors under the federal securities laws based on regulation by the Mexican government, its result is distinguishable on the ground that investors in that case essentially had foreign exchange losses, and not losses caused by insolvency of the issuing bank. Each of the holders of Mexican certificates of deposit received the same amount of pesos as were deposited, and the losses were the result of the Mexican government's devaluation of the peso. To the extent that Wolf interprets Marine Bank to allow regulation by an entity other than the federal government to displace the protection of the federal securities laws, we disagree under the supremacy rationale stated above
 The Fourth Circuit has similarly held that certificates of deposit issued by state-chartered savings and loans were not securities because of the State of Maryland's comprehensive regulatory scheme governing the issuing entities. Tafflin v. Levitt, 865 F.2d 595, 598-99 (4th Cir.1989), cert. granted on unrelated issue, --- U.S. ----, 109 S.Ct. 2428, 104 L.Ed.2d 985 (1989). We similarly disagree with this analysis based upon the supremacy rationale discussed above.
 
 
 [12]
 The BHCA covers "any company which has control over any bank or over any company that is or becomes a bank holding company by virtue of [the BHCA]." 12 U.S.C. Sec. 1841(a). After the divestiture of RBT, neither RBI nor its subsidiaries qualified as banks as defined in 12 U.S.C. Sec. 1841(c). RTS was specifically held not to be a bank in In re Republic Trust & Savings Co., 59 Bankr. 606, 612 (Bankr.N.D.Okla.1986), appeal denied, In re Republic Financial Corp., 77 Bankr. 282 (N.D.Okla.1987). After RBI divested its bank subsidiary, none of the remaining entities were members of the FDIC or the Federal Reserve System, and therefore they were not subject to federal regulation