REVES ET AL. *v.* ERNST & YOUNG

No. 88–1480.   Argued November 27, 1989—Decided February 21, 1990

MARSHALL, J., delivered the opinion for a unanimous Court with respect to Part II, and the opinion of the Court with respect to Parts I, III, and IV, in which BRENNAN, BLACKMUN, STEVENS, and KENNEDY, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 73. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which WHITE, O'CONNOR, and SCALIA, JJ., joined, *post*, p. 76.

*John R. McCambridge* argued the cause for petitioners. With him on the briefs were *Gary M. Elden, Jay R. Hoffman,* and *Robert R. Cloar.*

*Michael R. Lazerwitz* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Deputy Solicitor General Merrill, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman, Martha H. McNeely, Randall W. Quinn,* and *Eva Marie Carney.*

*John Matson* argued the cause for respondent. With him on the brief were *Carl D. Liggio, Kathryn A. Oberly,* and *Fred Lovitch.*\*

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether certain demand notes issued by the Farmers Cooperative of Arkansas and Oklahoma (Co-Op) are "securities" within the meaning of § 3(a)(10) of the Securities Exchange Act of 1934. We conclude that they are.

I

The Co-Op is an agricultural cooperative that, at the time relevant here, had approximately 23,000 members. In order to raise money to support its general business operations, the Co-Op sold promissory notes payable on demand by the holder. Although the notes were uncollateralized and uninsured, they paid a variable rate of interest that was adjusted

---

\*Briefs of *amicus curiae* urging reversal were filed for the Arkansas Securities Department by *John Steven Clark*, Attorney General of Arkansas; and for the North American Securities Administrators Association, Inc., by *Joseph C. Long*.

monthly to keep it higher than the rate paid by local financial institutions. The Co-Op offered the notes to both members and nonmembers, marketing the scheme as an "Investment Program." Advertisements for the notes, which appeared in each Co-Op newsletter, read in part: "YOUR CO-OP has more than $11,000,000 in assets to stand behind your investments. The Investment is not Federal *[sic]* insured but it is . . . Safe . . . Secure . . . and available when you need it." App. 5 (ellipses in original). Despite these assurances, the Co-Op filed for bankruptcy in 1984. At the time of the filing, over 1,600 people held notes worth a total of $10 million.

After the Co-Op filed for bankruptcy, petitioners, a class of holders of the notes, filed suit against Arthur Young & Co., the firm that had audited the Co-Op's financial statements (and the predecessor to respondent Ernst & Young). Petitioners alleged, *inter alia,* that Arthur Young had intentionally failed to follow generally accepted accounting principles in its audit, specifically with respect to the valuation of one of the Co-Op's major assets, a gasohol plant. Petitioners claimed that Arthur Young violated these principles in an effort to inflate the assets and net worth of the Co-Op. Petitioners maintained that, had Arthur Young properly treated the plant in its audits, they would not have purchased demand notes because the Co-Op's insolvency would have been apparent. On the basis of these allegations, petitioners claimed that Arthur Young had violated the antifraud provisions of the 1934 Act as well as Arkansas' securities laws.

Petitioners prevailed at trial on both their federal and state claims, receiving a $6.1 million judgment. Arthur Young appealed, claiming that the demand notes were not "securities" under either the 1934 Act or Arkansas law, and that the statutes' antifraud provisions therefore did not apply. A panel of the Eighth Circuit, agreeing with Arthur Young on both the state and federal issues, reversed. *Arthur Young & Co.* v. *Reves,* 856 F. 2d 52 (1988). We granted certiorari to ad-

dress the federal issue, 490 U. S. 1105 (1989), and now reverse the judgment of the Court of Appeals.

## II

### A

This case requires us to decide whether the note issued by the Co-Op is a "security" within the meaning of the 1934 Act. Section 3(a)(10) of that Act is our starting point:

> "The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is like-wise limited." 48 Stat. 884, as amended, 15 U. S. C. § 78c(a)(10).

The fundamental purpose undergirding the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market." *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 849 (1975). In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of

human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *SEC* v. *W. J. Howey Co.*, 328 U. S. 293, 299 (1946), and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Forman, supra*, at 847–848 (quoting H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). Congress therefore did not attempt precisely to cabin the scope of the Securities Acts.[1] Rather, it enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.

Congress did not, however, "intend to provide a broad federal remedy for all fraud." *Marine Bank* v. *Weaver*, 455 U. S. 551, 556 (1982). Accordingly, "[t]he task has fallen to the Securities and Exchange Commission (SEC), the body charged with administering the Securities Acts, and ultimately to the federal courts to decide which of the myriad financial transactions in our society come within the coverage of these statutes." *Forman, supra*, at 848. In discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation. See, *e. g.*, *Tcherepnin* v. *Knight*, 389 U. S. 332, 336 (1967) (in interpreting the term "security," "form should be disregarded for substance and the emphasis should be on economic reality"). Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called.

---

[1] We have consistently held that "[t]he definition of a security in § 3(a) (10) of the 1934 Act . . . is virtually identical [to the definition in the Securities Act of 1933] and, for present purposes, the coverage of the two Acts may be considered the same." *United Housing Foundation, Inc.* v. *Forman*, 421 U. S. 837, 847, n. 12 (1975) (citations omitted). We reaffirm that principle here.

A commitment to an examination of the economic realities of a transaction does not necessarily entail a case-by-case analysis of every instrument, however. Some instruments are obviously within the class Congress intended to regulate because they are by their nature investments. In *Landreth Timber Co.* v. *Landreth,* 471 U. S. 681 (1985), we held that an instrument bearing the name "stock" that, among other things, is negotiable, offers the possibility of capital appreciation, and carries the right to dividends contingent on the profits of a business enterprise is plainly within the class of instruments Congress intended the securities laws to cover. *Landreth Timber* does not signify a lack of concern with economic reality; rather, it signals a recognition that stock is, as a practical matter, always an investment if it has the economic characteristics traditionally associated with stock. Even if sparse exceptions to this generalization can be found, the public perception of common stock as the paradigm of a security suggests that stock, in whatever context it is sold, should be treated as within the ambit of the Acts. *Id.,* at 687, 693.

We made clear in *Landreth Timber* that stock was a special case, explicitly limiting our holding to that sort of instrument. *Id.,* at 694. Although we refused finally to rule out a similar *per se* rule for notes, we intimated that such a rule would be unjustified. Unlike "stock," we said, "'note' may now be viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context." *Ibid.* (citing *Securities Industry Assn.* v. *Board of Governors of Federal Reserve System,* 468 U. S. 137, 149–153 (1984)). While common stock is the quintessence of a security, *Landreth Timber, supra,* at 693, and investors therefore justifiably assume that a sale of stock is covered by the Securities Acts, the same simply cannot be said of notes, which are used in a variety of settings, not all of which involve investments. Thus,

the phrase "any note" should not be interpreted to mean literally "any note," but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts.[2]

Because the *Landreth Timber* formula cannot sensibly be applied to notes, some other principle must be developed to define the term "note." A majority of the Courts of Appeals that have considered the issue have adopted, in varying forms, "investment versus commercial" approaches that distinguish, on the basis of all of the circumstances surrounding the transactions, notes issued in an investment context (which are "securities") from notes issued in a commercial or consumer context (which are not). See, *e. g., Futura Development Corp.* v. *Centex Corp.*, 761 F. 2d 33, 40–41 (CA1 1985); *McClure* v. *First Nat. Bank of Lubbock, Texas*, 497 F. 2d 490, 492–494 (CA5 1974); *Hunssinger* v. *Rockford Business Credits, Inc.*, 745 F. 2d 484, 488 (CA7 1984); *Holloway* v. *Peat, Marwick, Mitchell & Co.*, 879 F. 2d 772, 778–779 (CA10 1989), cert. pending No. 89–532.

The Second Circuit's "family resemblance" approach begins with a presumption that *any* note with a term of more than nine months is a "security." See, *e. g., Exchange Nat. Bank of Chicago* v. *Touche Ross & Co.*, 544 F. 2d 1126, 1137 (CA2 1976). Recognizing that not all notes are securities, however, the Second Circuit has also devised a list of notes that it has decided are obviously not securities. Accord-

---

[2] An approach founded on economic reality rather than on a set of *per se* rules is subject to the criticism that whether a particular note is a "security" may not be entirely clear at the time it is issued. Such an approach has the corresponding advantage, though, of permitting the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition. One could question whether, at the expense of the goal of clarity, Congress overvalued the goal of avoiding manipulation by the clever and dishonest. If Congress erred, however, it is for that body, and not this Court, to correct its mistake.

ingly, the "family resemblance" test permits an issuer to rebut the presumption that a note is a security if it can show that the note in question "bear[s] a strong family resemblance" to an item on the judicially crafted list of exceptions, *id.*, at 1137–1138, or convinces the court to add a new instrument to the list, see, *e. g.*, *Chemical Bank* v. *Arthur Andersen & Co.*, 726 F. 2d 930, 939 (CA2 1984).

In contrast, the Eighth and District of Columbia Circuits apply the test we created in *SEC* v. *W. J. Howey Co.*, 328 U. S. 293 (1946), to determine whether an instrument is an "investment contract" to the determination whether an instrument is a "note." Under this test, a note is a security only if it evidences "(1) an investment; (2) in a common enterprise; (3) with a reasonable expection of profits; (4) to be derived from the entrepreneurial or managerial efforts of others." 856 F. 2d, at 54 (case below). Accord, *Baurer* v. *Planning Group, Inc.*, 215 U. S. App. D. C. 384, 391–393, 669 F. 2d 770, 777–779 (1981). See also *Underhill* v. *Royal*, 769 F. 2d 1426, 1431 (CA9 1985) (setting forth what it terms a "risk capital" approach that is virtually identical to the *Howey* test).

We reject the approaches of those courts that have applied the *Howey* test to notes; *Howey* provides a mechanism for determining whether an instrument is an "investment contract." The demand notes here may well not be "investment contracts," but that does not mean they are not "notes." To hold that a "note" is not a "security" unless it meets a test designed for an entirely different variety of instrument "would make the Acts' enumeration of many types of instruments superfluous," *Landreth Timber*, 471 U. S., at 692, and would be inconsistent with Congress' intent to regulate the entire body of instruments sold as investments, see *supra*, at 60–62.

The other two contenders—the "family resemblance" and "investment versus commercial" tests—are really two ways of formulating the same general approach. Because we

think the "family resemblance" test provides a more promising framework for analysis, however, we adopt it. The test begins with the language of the statute; because the Securities Acts define "security" to include "any note," we begin with a presumption that every note is a security.[3] We nonetheless recognize that this presumption cannot be irrebuttable. As we have said, *supra*, at 61, Congress was concerned with regulating the investment market, not with creating a general federal cause of action for fraud. In an attempt to give more content to that dividing line, the Second Circuit has identified a list of instruments commonly denominated "notes" that nonetheless fall without the "security" category. See *Exchange Nat. Bank*, *supra*, at 1138 (types of notes that are not "securities" include "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)"); *Chemical Bank*, *supra*, at 939 (adding to list "notes evidencing loans by commercial banks for current operations").

We agree that the items identified by the Second Circuit are not properly viewed as "securities." More guidance, though, is needed. It is impossible to make any meaningful inquiry into whether an instrument bears a "resemblance" to

---

[3] The Second Circuit's version of the family resemblance test provided that only notes *with a term of more than nine months* are presumed to be "securities." See *supra*, at 63. No presumption of any kind attached to notes of less than nine months' duration. The Second Circuit's refusal to extend the presumption to *all* notes was apparently founded on its interpretation of the statutory exception for notes with a maturity of nine months or less. Because we do not reach the question of how to interpret that exception, see *infra*, at 71, we likewise express no view on how that exception might affect the presumption that a note is a "security."

one of the instruments identified by the Second Circuit without specifying what it is about *those* instruments that makes *them* non-"securities." Moreover, as the Second Circuit itself has noted, its list is "not graven in stone," 726 F. 2d, at 939, and is therefore capable of expansion. Thus, some standards must be developed for determining when an item should be added to the list.

An examination of the list itself makes clear what those standards should be. In creating its list, the Second Circuit was applying the same factors that this Court has held apply in deciding whether a transaction involves a "security." First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." See, *e. g.*, *Forman*, 421 U. S., at 851 (share of "stock" carrying a right to subsidized housing not a security because "the inducement to purchase was solely to acquire subsidized low-cost living space; it was not to invest for profit"). Second, we examine the "plan of distribution" of the instrument, *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344, 353 (1943), to determine whether it is an instrument in which there is "common trading for speculation or investment," *id.*, at 351. Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. Compare *Landreth Timber*, 471

U. S., at 687, 693 (relying on public expectations in holding that common stock is always a security), with *id.*, at 697–700 (STEVENS, J., dissenting) (arguing that sale of business to single informed purchaser through stock is not within the purview of the Acts under the economic reality test). See also *Forman, supra*, at 851. Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. See, *e. g., Marine Bank*, 455 U. S., at 557–559, and n. 7.

We conclude, then, that in determining whether an instrument denominated a "note" is a "security," courts are to apply the version of the "family resemblance" test that we have articulated here: A note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument. If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors.

### B

Applying the family resemblance approach to this case, we have little difficulty in concluding that the notes at issue here are "securities." Ernst & Young admits that "a demand note does not closely resemble any of the Second Circuit's family resemblance examples." Brief for Respondent 43. Nor does an examination of the four factors we have identified as being relevant to our inquiry suggest that the demand notes here are not "securities" despite their lack of similarity to any of the enumerated categories. The Co-Op sold the notes in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit

in the form of interest.[1]  Indeed, one of the primary induce-
ments offered purchasers was an interest rate constantly re-
vised to keep it slightly above the rate paid by local banks
and savings and loans.  From both sides, then, the transac-
tion is most naturally conceived as an investment in a busi-
ness enterprise rather than as a purely commercial or con-
sumer transaction.

As to the plan of distribution, the Co-Op offered the notes
over an extended period to its 23,000 members, as well as to
nonmembers, and more than 1,600 people held notes when
the Co-Op filed for bankruptcy.  To be sure, the notes were
not traded on an exchange.  They were, however, offered
and sold to a broad segment of the public, and that is all we
have held to be necessary to establish the requisite "common
trading" in an instrument.  See, *e. g., Landreth Timber,
supra* (stock of closely held corporation not traded on any
exchange held to be a "security"); *Tcherepnin,* 389 U. S., at
337 (nonnegotiable but transferable "withdrawable capital
shares" in savings and loan association held to be a "secu-
rity"); *Howey,* 328 U. S., at 295 (units of citrus grove and
maintenance contract "securities" although not traded on
exchange).

The third factor — the public's reasonable perceptions — also
supports a finding that the notes in this case are "securities."
We have consistently identified the fundamental essence of a

[1] We emphasize that by "profit" in the context of notes, we mean "a
valuable return on an investment," which undoubtedly includes interest.
We have, of course, defined "profit" more restrictively in applying the
*Howey* test to what are claimed to be "investment contracts."  See, *e. g.,
Forman,* 421 U. S., at 852 ("[P]rofit" under the *Howey* test means either
"capital appreciation" or "a participation in earnings").  To apply this re-
strictive definition to the determination whether an instrument is a "note"
would be to suggest that notes paying a rate of interest not keyed to the
earning of the enterprise are not "notes" within the meaning of the Securi-
ties Acts.  Because the *Howey* test is irrelevant to the issue before us
today, see *supra,* at 64, we decline to extend its definition of "profit" be-
yond the realm in which that definition applies.

"security" to be its character as an "investment." See *supra*, at 61, 65. The advertisements for the notes here characterized them as "investments," see *supra*, at 59, and there were no countervailing factors that would have led a reasonable person to question this characterization. In these circumstances, it would be reasonable for a prospective purchaser to take the Co-Op at its word.

Finally, we find no risk-reducing factor to suggest that these instruments are not in fact securities. The notes are uncollateralized and uninsured. Moreover, unlike the certificates of deposit in *Marine Bank*, *supra*, at 557–558, which were insured by the Federal Deposit Insurance Corporation and subject to substantial regulation under the federal banking laws, and unlike the pension plan in *Teamsters* v. *Daniel*, 439 U. S. 551, 569–570 (1979), which was comprehensively regulated under the Employee Retirement Income Security Act of 1974, 88 Stat. 829, 29 U. S. C. § 1001 *et seq.* (1982 ed.), the notes here would escape federal regulation entirely if the Acts were held not to apply.

The court below found that "[t]he demand nature of the notes is very uncharacteristic of a security," 856 F. 2d, at 54, on the theory that the virtually instant liquidity associated with demand notes is inconsistent with the risk ordinarily associated with "securities." This argument is unpersuasive. Common stock traded on a national exchange is the paradigm of a security, and it is as readily convertible into cash as is a demand note. The same is true of publicly traded corporate bonds, debentures, and any number of other instruments that are plainly within the purview of the Acts. The demand feature of a note does permit a holder to eliminate risk quickly by making a demand, but just as with publicly traded stock, the liquidity of the instrument does not eliminate risk altogether. Indeed, publicly traded stock is even more readily liquid than are demand notes, in that a demand only eliminates risk when, and if, payment is made, whereas the

sale of a share of stock through a national exchange and the receipt of the proceeds usually occur simultaneously.

We therefore hold that the notes at issue here are within the term "note" in § 3(a)(10).

## III

Relying on the exception in the statute for "any note . . . which has a maturity at the time of issuance of not exceeding nine months," 15 U. S. C. § 78c(a)(10), respondent contends that the notes here are not "securities," even if they would otherwise qualify. Respondent cites Arkansas cases standing for the proposition that, in the context of the state statute of limitations, "[a] note payable on demand is due immediately." See, e. g., McMahon v. O'Keefe, 213 Ark. 105, 106, 209 S. W. 2d 449, 450 (1948) (statute of limitations is triggered by the date of issuance rather than by date of first demand). Respondent concludes from this rule that the "maturity" of a demand note within the meaning of § 3(a)(10) is immediate, which is, of course, less than nine months. Respondent therefore contends that the notes fall within the plain words of the exclusion and are thus not "securities."

Petitioners counter that the "plain words" of the exclusion should not govern. Petitioners cite the legislative history of a similar provision of the 1933 Act, 48 Stat. 76, 15 U. S. C. § 77c(a)(3), for the proposition that the purpose of the exclusion is to except from the coverage of the Acts only commercial paper—short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors. See S. Rep. No. 47, 73d Cong., 1st Sess., 3–4 (1933); H. R. Rep. No. 85, 73d Cong., 1st Sess., 15 (1933). Petitioners also emphasize that this Court has repeatedly held (see supra, at 60–63) that the plain words of the definition of a "security" are not dispositive, and that we consider the economic reality of the transaction to determine whether Congress intended the Securities Acts to apply. Petitioners therefore argue, with some force, that reading the exception

for short-term notes to exclude from the Acts' coverage investment notes of less than nine months' duration would be inconsistent with Congress' evident desire to permit the SEC and the courts flexibility to ensure that the Acts are not manipulated to investors' detriment. If petitioners are correct that the exclusion is intended to cover only commercial paper, these notes, which were sold in a large scale offering to unsophisticated members of the public, plainly should not fall within the exclusion.

We need not decide, however, whether petitioners' interpretation of the exception is correct, for we conclude that even if we give literal effect to the exception, the notes do not fall within its terms.

Respondent's contention that the demand notes fall within the "plain words" of the statute rests entirely upon the premise that Arkansas' statute of limitations for suits to collect demand notes is determinative of the "maturity" of the notes, as that term is used in the *federal* Securities Acts. The "maturity" of the notes, however, is a question of federal law. To regard States' statutes of limitations law as controlling the scope of the Securities Acts would be to hold that a particular instrument is a "security" under the 1934 Act in some States, but that the same instrument is not a "security" in others. Compare *McMahon, supra,* at 106 (statute runs from date of note), with 42 Pa. Cons. Stat. § 5525(7) (1988) (statute runs "from the later of either demand or any payment of principal of or interest on the instrument"). We are unpersuaded that Congress intended the Securities Acts to apply differently to the same transactions depending on the accident of which State's law happens to apply.

The CHIEF JUSTICE's argument in partial dissent is but a more artful statement of respondent's contention, and it suffers from the same defect. The CHIEF JUSTICE begins by defining "maturity" to mean the time when a note becomes due. *Post,* at 77 (quoting Black's Law Dictionary 1170 (3d ed. 1933)). Because a demand note is "immediately 'due' such

that an action could be brought at any time without any other demand than the suit," *post*, at 77, the CHIEF JUSTICE concludes that a demand note is due immediately for purposes of the federal securities laws. Even if the CHIEF JUSTICE is correct that the "maturity" of a note corresponds to the time at which it "becomes due," the authority he cites for the proposition that, as a matter of federal law, a demand note "becomes due" immediately (as opposed to when demand is made or expected to be made) is no more dispositive than is Arkansas case law. The CHIEF JUSTICE's primary source of authority is a treatise regarding the *state* law of negotiable instruments, particularly the Uniform Negotiable Instruments Law. See M. Bigelow, Law of Bills, Notes, and Checks v–vii (3d. ed. W. Lile rev. 1928). The quotation upon which the CHIEF JUSTICE relies is concerned with articulating the general *state*-law rule regarding when suit may be filed. The only other authority the CHIEF JUSTICE cites makes plain that state-law rules governing when a demand note becomes due are significant only in that they control the date on which statutes of limitation begins to run and whether demand must precede suit. See 8 C. J., Bills and Notes § 602, p. 406 (1916). Indeed, the treatise suggests that States were no more unanimous on those questions in 1933 than they are now. *Ibid.* In short, the dissent adds nothing to respondent's argument other than additional authority for what "maturity" means in certain state-law contexts. The dissent provides no argument for its implicit, but essential, premise that state rules concerning the proper method of collecting a debt control the resolution of the federal question before us.

Neither the law of Arkansas nor that of any other State provides an answer to the federal question, and as a matter of federal law, the words of the statute are far from "plain" with regard to whether demand notes fall within the exclusion. If it is plausible to regard a demand note as having an immediate maturity because demand *could* be made immediately, it is also plausible to regard the maturity of a demand note as

being in excess of nine months because demand *could* be made many years or decades into the future. Given this ambiguity, the exclusion must be interpreted in accordance with its purpose. As we have said, we will assume for argument's sake that petitioners are incorrect in their view that the exclusion is intended to exempt only commercial paper. Respondent presents no competing view to explain why Congress would have enacted respondent's version of the exclusion, however, and the only theory that we can imagine that would support respondent's interpretation is that Congress intended to create a bright-line rule exempting from the 1934 Act's coverage *all* notes of less than nine months' duration, because short-term notes are, as a general rule, sufficiently safe that the Securities Acts need not apply. As we have said, however, demand notes do not necessarily have short terms. In light of Congress' broader purpose in the Acts of ensuring that investments of all descriptions be regulated to prevent fraud and abuse, we interpret the exception not to cover the demand notes at issue here. Although the result might be different if the design of the transaction suggested that both parties contemplated that demand would be made within the statutory period, that is not the case before us.

## IV

For the foregoing reasons, we conclude that the demand notes at issue here fall under the "note" category of instruments that are "securities" under the 1933 and 1934 Acts. We also conclude that, even under respondent's preferred approach to § 3(a)(10)'s exclusion for short-term notes, these demand notes do not fall within the exclusion. Accordingly, we reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, concurring.

While I join the Court's opinion, an important additional consideration supports my conclusion that these notes are se-

curities notwithstanding the statute's exclusion for currency and commercial paper that has a maturity of no more than nine months. See 15 U. S. C. § 78c(a)(10) (§ 3(a)(10) of the Securities Exchange Act of 1934). The Courts of Appeals have been unanimous in rejecting a literal reading of that exclusion. They have instead concluded that "when Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities." *Sanders* v. *John Nuveen & Co.*, 463 F. 2d 1075, 1080 (CA7), cert. denied, 409 U. S. 1009 (1972). This view was first set out in an opinion by Judge Sprecher, and soon thereafter endorsed by Chief Judge Friendly. *Zeller* v. *Bogue Electric Mfg. Corp.*, 476 F. 2d 795, 800 (CA2), cert. denied, 414 U. S. 908 (1973). Others have adopted the same position since. See, *e. g.*, *McClure* v. *First Nat. Bank of Lubbock, Texas*, 497 F. 2d 490, 494–495 (CA5 1974), cert. denied, 420 U. S. 930 (1975); *Holloway* v. *Peat, Marwick, Mitchell & Co.*, 879 F. 2d 772, 778 (CA10 1989); *Baurer* v. *Planning Group, Inc.*, 215 U. S. App. D. C. 384, 389–391, 669 F. 2d 770, 775–777 (1981).

In my view such a settled construction of an important federal statute should not be disturbed unless and until Congress so decides. "[A]fter a statute has been construed, either by this Court or by a consistent course of decision by other federal judges and agencies, it acquires a meaning that should be as clear as if the judicial gloss had been drafted by the Congress itself." *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 268 (1987) (STEVENS, J., concurring in part and dissenting in part); see also *Chesapeake & Ohio R. Co.* v. *Schwalb*, 493 U. S. 40, 51 (1989) (STEVENS, J., concurring in judgment). What I have said before of taxation applies equally to securities regulation: "there is a strong interest in enabling" those affected "to predict the legal consequences of their proposed actions, and there is an even stronger general interest in ensuring that the responsibility for making changes in settled law rests squarely on

the shoulders of Congress." *Commissioner* v. *Fink*, 483 U. S. 89, 101 (1987) (dissenting opinion). Past errors may in rare cases be "sufficiently blatant" to overcome the "'strong presumption of continued validity that adheres in the judicial interpretation of a statute,'" but this is not such a case. *Id.*, at 103 (quoting *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 424 (1986)).

Indeed, the agreement among the Courts of Appeals is made all the more impressive in this case because it is buttressed by the views of the Securities and Exchange Commission. See Securities Act Release No. 33–4412, 26 Fed. Reg. 9158 (1961) (construing § 3(a)(3) of the Securities Act of 1933, the 1933 Act's counterpart to § 3(a)(10) of the 1934 Act). We have ourselves referred to the exclusion for notes with a maturity not exceeding nine months as an exclusion for "commercial paper." *Securities Industry Assn.* v. *Board of Governors of Federal Reserve System*, 468 U. S. 137, 150–152 (1984). Perhaps because the restriction of the exclusion to commercial paper is so well established, respondents admit that they did not even argue before the Court of Appeals that their notes were covered by the exclusion. A departure from this reliable consensus would upset the justified expectations of both the legal and investment communities.

Moreover, I am satisfied that the interpretation of the statute expounded by Judge Sprecher and Judge Friendly was entirely correct. As Judge Friendly has observed, the exclusion for short-term notes must be read in light of the prefatory language in § 2 of the 1933 Act and § 3 of the 1934 Act. See *Exchange Nat. Bank of Chicago* v. *Touche Ross & Co.*, 544 F. 2d 1126, 1131–1132, and nn. 7–10 (CA2 1976). Pursuant to that language, definitions specified by the Acts may not apply if the "context otherwise requires." *Marine Bank* v. *Weaver*, 455 U. S. 551, 556 (1982) (the "broad statutory definition is preceded, however, by the statement that the terms mentioned are not to be considered securities if 'the context otherwise requires . . .'"); accord, *Landreth Timber*

*Co.* v. *Landreth,* 471 U. S. 681, 697–698 (1985) (STEVENS, J., dissenting). The context clause thus permits a judicial construction of the statute which harmonizes the facially rigid terms of the 9-month exclusion with the evident intent of Congress. *Exchange Nat. Bank,* 544 F. 2d, at 1132–1133. The legislative history of § 3(a)(3) of the 1933 Act indicates that the exclusion was intended to cover only commercial paper, and the SEC has so construed it. *Sanders,* 463 F. 2d, at 1079, and nn. 12–13; *Zeller,* 476 F. 2d, at 799–800, and n. 6. As the Courts of Appeals have agreed, there is no apparent reason to construe § 3(a)(10) of the 1934 Act differently. *Sanders,* 463 F. 2d, at 1079–1080, and n. 15; *Zeller,* 476 F. 2d, at 800. See also Comment, The Commercial Paper Market and the Securities Acts, 39 U. Chi. L. Rev. 362, 398 (1972).

For these reasons and those stated in the opinion of the Court, I conclude that the notes issued by respondents are securities within the meaning of the 1934 Act.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, concurring in part and dissenting in part.

I join Part II of the Court's opinion, but dissent from Part III and the statements of the Court's judgment in Parts I and IV. In Part III, the Court holds that these notes were not covered by the statutory exemption for "any note . . . which has a maturity at the time of issuance of not exceeding nine months." Treating demand notes as if they were a recent development in the law of negotiable instruments, the Court says "if it is plausible to regard a demand note as having an immediate maturity because demand *could* be made immediately, it is also plausible to regard the maturity of a demand note as being in excess of nine months because demand *could* be made many years or decades into the future. Given this ambiguity, the exclusion must be interpreted in accordance with its purpose." *Ante,* at 72–73.

But the terms "note" and "maturity" did not spring full blown from the head of Congress in 1934. Neither are demand notes of recent vintage. "Note" and "maturity" have been terms of art in the legal profession for centuries, and a body of law concerning the characteristics of demand notes, including their maturity, was in existence at the time Congress passed the 1934 Act.

In construing any terms whose meanings are less than plain, we depend on the common understanding of those terms at the time of the statute's creation. See *Gilbert* v. *United States*, 370 U. S. 650, 655 (1962) ("[I]n the absence of anything to the contrary it is fair to assume that Congress use[s a] word in [a] statute in its common-law sense"); *Roadway Express, Inc.* v. *Piper*, 447 U. S. 752, 759 (1980) (in construing a word in a statute, "we may look to the contemporaneous understanding of the term"); *Standard Oil Co. of New Jersey* v. *United States*, 221 U. S. 1, 59 (1911) (common-law meaning "presumed" to have been Congress' intent); see also *Lorillard* v. *Pons*, 434 U. S. 575, 583 (1978); *United States* v. *Spencer*, 839 F. 2d 1341, 1344 (CA9 1988). Contemporaneous editions of legal dictionaries defined "maturity" as "[t]he time when a . . . note becomes due." Black's Law Dictionary 1170 (3d ed. 1933); Cyclopedic Law Dictionary 649 (2d ed. 1922). Pursuant to the dominant consensus in the case law, instruments payable on demand were considered immediately "due" such that an action could be brought at any time without any other demand than the suit. See, *e. g.*, M. Bigelow, Law of Bills, Notes, and Checks § 349, p. 265 (3d ed. W. Lile rev. 1928); 8 C. J., Bills and Notes § 602, p. 406, and n. 83 (1916). According to Bigelow:

> "So far as maker and acceptor are concerned, paper payable . . . 'on demand' is due from the moment of its delivery, and payment may be required on any business day, including the day of its issue, within the statute of limitations. In other words, as to these parties *the paper is at maturity all the time,* and no demand of payment is nec-

essary before suit thereon." Bigelow, *supra*, § 349, at 265 (emphasis added; emphasis in original deleted; footnote omitted).

To be sure, demand instruments were considered to have "the peculiar quality of having two maturity dates — one for the purpose of holding to his obligation the party primarily liable (*e. g.* maker), and the other for enforcing the contracts of parties secondarily liable (*e. g.* drawer and indorsers)." Bigelow, *supra*, § 350, at 266 (emphasis omitted). But only the rule of immediate maturity respecting makers of demand notes has any bearing on our examination of the exemption; the language in the Act makes clear that it is the "maturity at time of issuance" with which we are concerned. 15 U. S. C. § 78c(a)(10). Accordingly, in the absence of some compelling indication to the contrary, the maturity date exemption must encompass demand notes because they possess "maturity at the time of issuance of not exceeding nine months." *

---

*Reference to the state common law of negotiable instruments does not suggest that "Congress intended the Securities Acts to apply differently to the same transactions depending on the accident of which State's law happens to apply." See *ante*, at 71. Rather, in the absence of a *federal* law of negotiable instruments, cf. *De Sylva* v. *Ballentine*, 351 U. S. 570, 580 (1956) ("[T]here is no federal law of domestic relations, which is primarily a matter of state concern"), or other alternative sources for discerning the applicability of the statutory term "maturity" to demand notes, we are dependent on the state common law at the time of the Act's creation as a basis for a nationally uniform answer to this "federal question." As we said in *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 47 (1989):

"That we are dealing with a uniform federal rather than a state definition does not, of course, prevent us from drawing on general state-law principles to determine 'the ordinary meaning of the words used.' Well-settled state law can inform our understanding of what Congress had in mind when it employed a term it did not define."

See also 2A C. Sutherland on Statutory Construction § 50.04, pp. 438–439 (4th ed. 1984) (noting the "utility" found by various courts, including this Court, in "examining a federal statute with reference to the common law of the various states as it existed at the time the statute was enacted"). In 1934, when this statute was enacted, as is true today, the American law of

Petitioners and the lower court decisions cited by JUSTICE STEVENS rely, virtually exclusively, on the legislative history of § 3(a)(3) of the 1933 Act for the proposition that the term "any note" in the exemption in § 3(a)(10) of the 1934 Act encompass only notes having the character of short-term "commercial paper" exchanged among sophisticated traders. I am not altogether convinced that the legislative history of § 3(a)(3) supports that interpretation even with respect to the term "any note" in the exemption in § 3(a)(3), and to bodily transpose that legislative history to another statute has little to commend it as a method of statutory construction.

The legislative history of the 1934 Act—under which this case arises—contains nothing which would support a restrictive reading of the exemption in question. Nor does the legislative history of § 3(a)(3) of the 1933 Act support the asserted limited construction of the exemption in § 3(a)(10) of the 1934 Act. Though the two most pertinent sources of congressional commentary on § 3(a)(3)—H. R. Rep. No. 85, 73d Cong., 1st Sess., 15 (1933) and S. Rep. No. 47, 73d Cong., 1st Sess., 3–4 (1933)—do suggest an intent to limit § 3(a)(3)'s exemption to short-term commercial paper, the references in those Reports to commercial paper simply did not survive in the language of the enactment. Indeed, the Senate Report stated "[n]otes, drafts, bills of exchange, and bankers' acceptances *which are commercial paper* and arise out of current *commercial, agricultural, or industrial* transactions, *and which are not intended to be marketed to the public*, are exempted. . . ." S. Rep. No. 47, *supra*, at 3–4 (emphasis added). Yet the provision enacted in § 3(a)(3)

---

negotiable instruments was found in the state-court reporters. Though the States were not unanimous on the issue of the time of maturity of demand notes, virtually every matter of state common law evokes a majority and minority position. The vast number of courts that adopted the majority view of immediate maturity, see 8 C. J., Bills and Notes § 602, p. 406, n. 83 (1916), compels the conclusion that the immediate maturity rule constituted "well-settled state law" or a "general state-law principle" at the time § 3(a)(10) was enacted.

of the 1933 Act exempts "*[a]ny* note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months . . . ." 15 U. S. C. § 77c(a)(3) (emphasis added).

Such broadening of the language in the enacted version of § 3(a)(3), relative to the prototype from which it sprang, cannot easily be dismissed in interpreting § 3(a)(3). *A fortiori*, the legislative history's restrictive meaning cannot be imputed to the facially broader language in a different provision of another Act. Although I do not doubt that both the 1933 and 1934 Act exemptions encompass short-term commercial paper, the expansive language in the statutory provisions is strong evidence that, in the end, Congress meant for commercial paper merely to be a subset of a larger class of exempted short-term instruments.

The plausibility of imputing a restrictive reading to § 3(a) (10) from the legislative history of § 3(a)(3) is further weakened by the imperfect analogy between the two provisions in terms of both phraseology and nature. Section 3(a)(10) lacks the cryptic phrase in § 3(a)(3) which qualifies the class of instruments eligible for exemption as those arising "out of . . . current transaction[s] or the proceeds of which have been or are to be used for current transactions . . . . " While that passage somehow may strengthen an argument for limiting the exemption in § 3(a)(3) to commercial paper, its absence in § 3(a)(10) conversely militates against placing the same limitation thereon.

The exemption in § 3(a)(3) excepts the short-term instruments it covers solely from the registration requirements of the 1933 Act. The same instruments are not exempted from the 1933 Act's antifraud provisions. Compare 15 U. S. C. § 77c(a)(3) with 15 U. S. C. §§ 77*l*(2) and 77q(c); see also *Securities Industry Assn.* v. *Board of Governors of Federal*

81

*Reserve System*, 468 U. S. 137, 151 (1984).   By contrast, the exemption in § 3(a)(10) of the 1934 Act exempts instruments encompassed thereunder from the entirety of the coverage of the 1934 Act including, conspicuously, the Act's antifraud provisions.

JUSTICE STEVENS argues that the suggested limited reading of the exemption in § 3(a)(10) of the 1934 Act "harmonizes" the plain terms of that provision with the legislative history of the 1933 Act.   *Ante*, at 76.   In his view, such harmony is required by the "context clause" at the beginning of the 1934 Act's general definition of "security."   It seems to me, instead, that harmony is called for primarily between § 3(a)(10)'s general definition and its specific exemption. The fairest reading of the exemption in light of the context clause is that the situation described in the exemption—notes with maturities at issue of less than nine months— is one contextual exception Congress especially wanted courts to recognize.   Such a reading does not render the context clause superfluous; it merely leaves it to the judiciary to flesh out additional "context clause" exceptions.

JUSTICE STEVENS also states that we have previously referred to the exemption in § 3(a)(10) as an exclusion for commercial paper.   *Ante*, at 76 (citing *Securities Industry Assn.*, *supra*, at 150–152).   In the *Securities Industry Assn.* dictum, however, we described the exemption in § 3(a)(10) merely as "encompass[ing]" commercial paper and in no way concluded that the exemption was limited to commercial paper.   See 468 U. S., at 150–151.   Indeed, in *Securities Industry Assn.*, our purpose in referring to § 3(a)(10) was to assist our determination whether commercial paper was even *included* in the 73d Congress' use of the words "notes . . . or other securities" in the Glass-Steagall Banking Act of 1933.

In sum, there is no justification for looking beyond the plain terms of § 3(a)(10), save for ascertaining the meaning of "maturity" with respect to demand notes.   That inquiry re-

veals that the Co-Op's demand notes come within the purview of the section's exemption for short-term securities. I would therefore affirm the judgment of the Court of Appeals, though on different reasoning.