[No. 18145-6-III.  Division Three.  June 22, 2000.]

HARLAN DOUGLASS, *Appellant*, v. KENNETH W. STANGER, ET AL., *Defendants*, BARNES MANAGEMENT AND DEVELOPMENT, INC., ET AL., *Respondents*.

*Michael J. Murphy, Robynne T. Parkinson,* and *Marisa M. Bavand* (of *Groff & Murphy, P.L.L.C.*), for appellant.

*Robert A. Dunn* and *Michael S. Bissell* (of *McCormick Dunn & Black, P.S.*), for respondents.

SWEENEY, J. — A security has been defined liberally and broadly to include any note. In fact, there is a presumption that every note is a security. *Reves v. Ernst & Young*, 494 U.S. 56, 65, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990). In this

case, Harlan Douglass gave Kenneth Stanger $23,000 in exchange for a promissory note and an "Investment Agreement" promising a 40 percent ownership interest in a shopping center property and development. Mr. Stanger then formed another corporation with Orville Barnes; and together they developed the shopping center—without Mr. Douglass. The first question presented is whether the note and investment agreement are a security under the Washington State Securities Act (WSSA), chapter 21.20 RCW. The trial court concluded they were not and dismissed Mr. Douglass's claim of securities fraud. We conclude that whether the note and investment agreement rise to the level of a security is a question of fact.

We also conclude, however, that Mr. Douglass had sufficient notice to prompt an inquiry more than three years before he sued. His securities fraud claim is, therefore, barred by the statute of limitations. We, therefore, affirm the trial court's summary dismissal of Mr. Douglass's action.

Mr. Douglass also claimed common law fraud, which the trial court dismissed based on the statute of limitations. We agree with the trial court's conclusion and affirm.

Finally, Mr. Douglass claimed that his relationship with Mr. Barnes was that of joint venturer and that Mr. Stanger was Mr. Barnes' agent. The court also dismissed these claims. Again, we agree and affirm the trial court's dismissal.

## FACTS

Kenneth Stanger approached Mr. Douglass in 1988 with a proposal to invest in the development of the Colville Valley Shopping Center. Mr. Stanger represented that the project was sponsored and supported by McCarthy Management. Mr. Barnes owned McCarthy Management. Mr. Stanger forwarded the investment information to Mr. Douglass on McCarthy Management letterhead. Mr. Douglass did not know Mr. Stanger very well. He was,

however, familiar with Mr. Barnes and his property management company.

On July 7, 1989, Mr. Douglass and Mr. Stanger signed an "Investment Agreement." It spelled out the terms of their "ownership in the property and development [referred to as the] 'Colville Valley Shopping Center[.]' " The agreement further provided that a general partnership would become the owner/developer of the project. The general partnership would be formed, "[s]ubject to annexation [by the City of Colville of the proposed site for the center], zoning, signed lease agreements . . . and construction financing . . . ." "If the project . . . [did] not receive [the just mentioned] approvals . . . by October 1, 1989," Mr. Douglass had two options: He could ask for and receive a return of his investment plus interest, payable within 30 days, or he could continue with his investment "until such time as the aforementioned approvals are in place and [the] project can be completed." The agreement also set a final date of January 31, 1990, to accomplish all of this. And it provided for repayment of Mr. Douglass's investment within 30 days of January 31, 1990, if the developer failed to obtain the necessary approvals. Mr. Stanger also signed a promissory note payable to Mr. Douglass for $23,000.

In November 1989, Mr. Stanger incorporated the Colville Valley Shopping Center. The articles of incorporation do not specify that the corporate purpose was to develop a shopping center in Colville. And they name Mr. Barnes and Mr. Douglass as directors.

Mr. Stanger also asked the Colville City Council to annex the proposed site starting in 1989. The minutes of the city council meetings describe Mr. Stanger as a representative of McCarthy Management. The petition for annexation lists McCarthy Management as the petitioner. A March 3, 1989 memo from Colville's Director of Building and Planning also identifies McCarthy Management as asking for annexation. "Virtually all of the correspondence from [Mr.] Stanger was on McCarthy Management and Development letterhead, and virtually all of the letters from the prospec-

tive tenants were addressed to [Mr.] Stanger at McCarthy Investment and Development Company."

The project did not meet the agreement's required deadline, January 31, 1990. Mr. Douglass, nonetheless, "reaffirmed" the investment relationship by letter to Mr. Stanger, dated January 24, 1990: "This letter is to advise you and give you notice that I will remain as a partner in the Colville Shopping Center and I will not relinquish that position." Mr. Stanger kept Mr. Douglass informed of his ongoing work to attract tenants for the project. Mr. Stanger directed his memoranda to both Mr. Douglass and to Mr. Barnes.

Mr. Douglass personally met with Mr. Barnes twice. In the fall of 1991, Mr. Douglass "went to [Mr. Barnes'] office to discuss the Colville Shopping Center Project" and they "briefly discussed the Project." Mr. Barnes "indicated that the project was proceeding ahead, although there had been some delays and setbacks" and "[h]e was optimistic about the prospects for the Center."

In 1993, Mr. Douglass "met with Mr. Barnes to discuss the possible assignment of Kenneth Stanger's commissions from McCarthy Management" to satisfy Mr. Stanger's $23,000 note to Mr. Douglass.

In 1996, Mr. Douglass found out that Mr. Stanger and Mr. Barnes had purchased and later sold—in their names only—the property which Mr. Stanger had told Mr. Douglass he was pursuing for the shopping center. When Mr. Douglass learned of the purchase and sale of the property, he "immediately requested an accounting of the investment from Orville Barnes."

On November 7, 1996, Mr. Douglass sued for breach of contract, breach of fiduciary duties, fraud/intentional misrepresentation, violation of Washington's securities laws, and for an accounting.

Following argument on Mr. Barnes' and McCarthy Management's motions for summary judgment, the court entered the following orders:

(1) November 5, 1997. The court dismissed all causes of action against Mr. Barnes except for securities fraud. It concluded Mr. Douglass failed to produce evidence that Mr. Barnes was a party to the agreement between Mr. Douglass and Mr. Stanger or that Mr. Stanger had apparent authority to enter any agreement.

(2) January 20, 1998. The court dismissed Mr. Douglass's cause of action against Mr. Barnes and McCarthy Management for securities fraud. The court concluded that Mr. Douglass's investment agreement was not a security.

(3) June 22, 1998. The court dismissed Mr. Douglass's third cause of action against McCarthy Management for fraud/intentional misrepresentation. The court concluded the statute of limitation had run.

(4) December 18, 1998. The court entered a "Stipulation and Order to Continue Trial Date and CR 54(b) Certification Regarding Dismissal of Orville and Jane Doe Barnes." It certified for immediate appeal the dismissal of all causes of action against the Barneses personally. It also certified the judgment dismissing the fraud/intentional misrepresentation and securities fraud actions against McCarthy Management.

## DISCUSSION

### A. JOINT VENTURE

Mr. Douglass argues alternatively that Mr. Barnes is liable as a participant in a joint venture to develop the shopping center project, or he is liable because Mr. Stanger had apparent authority to act as Mr. Barnes' agent.

A joint venture requires an express or implied contract for a common purpose, a community of interest, and an equal right to voice and control of the enterprise. *Paulson v. County of Pierce*, 99 Wn.2d 645, 654, 664 P.2d 1202 (1983).

Mr. Barnes and Mr. Stanger entered into a written interim agreement in April 1991 to share the profits if the shopping center project became a reality. He and Mr. Stanger purchased the property in their own names in 1992. But Mr. Barnes argues he neither expressly nor impliedly agreed to develop the project with Mr. Douglass. Mr. Barnes also points out that the investment agreement expired on January 31, 1990.

Mr. Douglass counters that his January 24, 1990 letter to Mr. Stanger reaffirmed his investor status in the project and extended his interest to a time when Mr. Barnes was involved in the development. That letter, however, was addressed to Mr. Stanger only. And he offers no evidence that Mr. Barnes was aware of it.

Mr. Douglass argues, nonetheless, that Mr. Barnes must have been aware of his continued involvement because he personally discussed the project with Mr. Barnes in the fall of 1991. Mr. Barnes told him at that time that he was still hopeful about the project. Those remarks do not, however, support an inference that Mr. Barnes agreed to develop the shopping center project with Mr. Douglass, knew about Mr. Douglass's 1989 investment agreement with Mr. Stanger, or was aware that Mr. Douglass believed he was part of the venture.

Similarly, the fact Mr. Stanger incorporated the Colville Valley Shopping Center in November 1989 with Mr. Barnes as a director and the fact Mr. Stanger sent both Mr. Douglass and Mr. Barnes written memos about the shopping center project do not raise a reasonable inference that Mr. Barnes agreed to Mr. Douglass's involvement in the project as an investor. Mr. Barnes did not have to clarify or repudiate any inference that Mr. Douglass may have drawn when he was neither aware of, nor should have been aware of the facts giving rise to that inference. *See Smith v. Bates Technical College*, 139 Wn.2d 793, 800, 991 P.2d 1135 (2000). The memos, therefore, do not support an implied agreement on Mr. Barnes' part to a joint venture with Mr. Douglass. *See Paulson*, 99 Wn.2d at 654-55.

Mr. Stanger, not Mr. Barnes, signed the articles of incorporation. And it is undisputed that Mr. Stanger added Mr. Barnes' name as a director without consulting him. On this record there is no evidence that supports Mr. Douglass's assertion that he and Mr. Barnes were joint venturers. The trial court then properly dismissed the claim.

## B. AGENCY

■ Mr. Douglass next argues that Mr. Barnes is liable because Mr. Stanger had apparent authority to act as Mr. Barnes' agent.

An agent binds his principal if the agent acts with apparent authority. *Hansen v. Horn Rapids O.R.V. Park*, 85 Wn. App. 424, 932 P.2d 724 (1997). To prove agency, Mr. Douglass must show some objective manifestations by the principal, here Mr. Barnes, that reasonably led him to believe that Mr. Stanger was Mr. Barnes' agent. *See Hansen*, 85 Wn. App. at 430. The manifestations must be objective. Mr. Douglass's subjective beliefs are not enough. *See id.* Apparent authority may be inferred from the acts of the principal only. *Id.*

Here, Mr. Stanger and Mr. Barnes expressly agreed that Mr. Stanger could not bind Mr. Barnes to a promise or a representation without express authorization for a particular transaction. And here, Mr. Barnes did not expressly authorize Mr. Stanger to represent that he was involved in the project.

Mr. Stanger did use McCarthy Management letterhead. So certainly Mr. Douglass could reasonably draw the inference that Mr. Stanger acted with the apparent authority of McCarthy Management. And the superior court, therefore, appropriately denied McCarthy Management's motion to dismiss Mr. Douglass's claim for breach of contract and breach of fiduciary duty. But it does not follow that Mr. Stanger had apparent authority to act as *Mr. Barnes'* agent. No reasonable person could make that inference based on the evidence in this record. Summary dismissal of the apparent agency claim against Mr. Barnes was, therefore,

appropriate. *See Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

### C. WASHINGTON SECURITIES ACT

A "security" is "any note; . . . investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture[.]" RCW 21.20.005(12). It is unlawful for any person, in connection with the offer or sale of any security, "[t]o make any untrue statement of a material fact . . . ." RCW 21.20.010(2).

Mr. Douglass contends that the 1989 agreement and promissory note are a security. RCW 21.20.005(12). And Mr. Stanger and Mr. Barnes induced him to purchase that security by representing "his investment would be used to acquire and develop certain real property, which would be transferred to a corporation in which Douglass owned a substantial interest."

The trial court concluded that the promissory note and investment agreement were not a security.

■ ■ Under the *Reves* test, a note is a security if it provides money for a profit-making business, is commonly traded for investment, and the investor expects to profit from the business. *Reves v. Ernst & Young*, 494 U.S. 56, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990).

In *Reves*, the United States Supreme Court adopted the "family resemblance" test. *Reves*, 494 U.S. at 64-65. The *Reves* analysis begins with the presumption that a note—any note—is a security. *Id.* at 65. The burden is on the defendant to rebut that presumption. *Id.* at 67.

The *Reves*' family resemblance test requires four considerations. First, why did the seller and buyer enter into the transaction? Specifically, is the purpose of the transaction to raise money for a business enterprise? Or is it, instead,

for consumer goods or some other noncommercial reason?[1] Second, is the note commonly traded for speculation or investment? Third, we look at the reasonable expectations of the investing public. What are the economic realities? Fourth, and finally, we look at whether another regulatory scheme significantly reduces the risk associated with the note and investment agreement and thereby renders application of the securities act regulation unnecessary. *Reves*, 494 U.S. at 66-67.

*1. Commercial motivations.* Mr. Douglass signed not only a note, but also an investment agreement. The deal here was that in exchange for $23,000 he would receive a 40 percent ownership interest in real estate and a development to be called the Colville Valley Shopping Center. The agreement called for the formation of a general partnership. He was promised and expected ownership and profit.

This is not then a simple short-term note for a noncommercial purpose. It anticipated the purchase of land and development of a substantial shopping center.

*2. Plan of distribution.* Some securities by their very nature are commonly traded for speculation or investment and are, therefore, beyond argument, securities. *Securities & Exch. Comm'n v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S. Ct. 120, 88 L. Ed. 88 (1943). But the reach of securities acts does not stop with the obvious or the common place. *Id.* Certainly the investment agreement here would not be commonly traded for speculation or investment. It, nonetheless, contemplates a speculative venture. And nothing in the agreement would preclude Mr. Douglass from selling, assigning, or encumbering his interest.

*3. Reasonable expectations.* Next, we look at the reasonable expectations of the investing public. Read together,

---

[1] "[T]ypes of notes that are not 'securities' include 'the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.'" *Reves*, 494 U.S. at 65 (citing *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976)).

this note and the investment agreement create the expectation of ownership in a piece of property and development of a shopping center. The expected profits therefrom went beyond simply interest from a promissory note. And Mr. Stanger gave no security for this note. This was then a speculative venture in which Mr. Douglass expected to profit.

4. *Other regulatory scheme.* Finally, no other regulatory schemes govern this transaction specifically.

██ In Washington, we also add a policy consideration to the *Reves'* test. The primary policy of the WSSA is "to protect investors." And so we construe the Act liberally. *Ito Int'l Corp. v. Prescott, Inc.*, 83 Wn. App. 282, 292, 921 P.2d 566 (1996). Given this liberal construction and given the *Reves'* rebuttable presumption that every note is a security, Mr. Douglass has raised an issue of fact as to whether the note and investment agreement here constitute a security under the WSSA. The trial court therefore erred when it held as a matter of law that the investment documents here were not securities.

### D. STATUTE OF LIMITATIONS

██ This holding does not, however, end our inquiry. Mr. Douglass's securities fraud case is based upon the same facts as his common law fraud action. The trial court dismissed the common law fraud action based upon the statute of limitations. RCW 4.16.080(4). Mr. Douglass argues that the trial court erred when it concluded that he had notice of the fraud more than three years prior to the commencement of the suit. The WSSA, specifically RCW 21.20.430(4)(b),[2] also imposes a three-year statute of limitation on securities fraud claims.

McCarthy Management argued to the trial court that Mr. Douglass had constructive notice of the alleged fraud when

---

[2] RCW 21.20.430(4)(b) provides, as follows: "No person may sue under this section . . . more than three years after a violation of the provisions of RCW 21.20.010, either was discovered by such person or would have been discovered by him or her in the exercise of reasonable care."

Mr. Stanger and Mr. Barnes recorded their purchase of the shopping center property in September 1992. It relied on *Strong v. Clark*[3] for the proposition that recording is notice to "all persons" of a change in ownership.

Mr. Douglass argues that *Strong* is distinguishable and relies instead on *Aberdeen Federal Savings & Loan Ass'n v. Hanson.*[4] There, the court stated that imputation of constructive notice from a recorded document is appropriate "only if . . . 'ordinary prudence and business judgment' required examination of the record." *Aberdeen Fed. Sav. & Loan Ass'n v. Hanson*, 58 Wn. App. 773, 777, 794 P.2d 1322 (1990). Mr. Douglass argues that "to impose upon an investor . . . a duty to scour the public records periodically, after he had already made an investment, to ensure that he is not being cheated or deceived by his co-investors, would elevate the statute of limitations to a favored defense . . . ." Petitioner's Suppl. Brief at 11.

We believe that Mr. Douglass was on inquiry notice more than three years before he filed his lawsuit. First, his complaint for securities fraud and common law fraud alleges that Mr. Stanger as Mr. Barnes' agent solicited his investment to purchase real property for the shopping center site. Further, Mr. Stanger told Mr. Douglass that he would transfer title to the property so acquired to a corporation in which Mr. Douglass would have a substantial interest. Instead, Mr. Stanger took the real property and sold it for his own and Mr. Barnes' personal gain.

Second, in November 1989, Mr. Stanger filed articles of incorporation for the Colville Valley Shopping Center and named Mr. Douglass as a director. The articles were filed for only one year.[5] As a director, Mr. Douglass should have

---

[3] 56 Wn.2d 230, 352 P.2d 183 (1960).

[4] 58 Wn. App. 773, 794 P.2d 1322 (1990).

[5] RCW 23.86.035(1) provides, as follows:

"Each association subject to this chapter shall have the following powers:

"(1) To have perpetual succession by its corporation name unless a limited period of duration is stated in the articles of incorporation."

known that Mr. Stanger had failed to transfer the property to the corporation or renew the articles of incorporation for the Colville Valley Shopping Center. He also must have known that the corporation was inactive. No meetings were held. It transacted no business. Finally, Mr. Douglass did not ask Mr. Stanger about the status of the property. He did not ask whether Mr. Stanger still held a purchase option for the property. He did not ask whether Mr. Stanger had purchased the property. Or, if he had, why he had not transferred it to the corporation.

Lack of knowledge of fraud can be excused, but only if the claimant shows "impediments to an earlier prosecution of the claim," including the reasons why the claimant did not know of the cause of action, the means used by the culprits to keep him ignorant, and how he first obtained knowledge of the fraud. *In re Estate of Sackman*, 34 Wn.2d 864, 869, 210 P.2d 682 (1949). "[E]ven in an action for fraud where a fiduciary relation exists, the burden is upon the plaintiff to show that the facts constituting the fraud were not discovered or could not [be] discovered until within 3 years prior to the commencement of the action." *Interlake Porsche + Audi, Inc. v. Bucholz*, 45 Wn. App. 502, 518, 728 P.2d 597 (1986). The question of due diligence is ordinarily a question of fact. But the issue can be decided as a matter of law if reasonable minds could reach but one conclusion. *Allen v. State*, 118 Wn.2d 753, 826 P.2d 200 (1992).

Mr. Stanger and McCarthy Management had a fiduciary relationship with Mr. Douglass, as the sellers of a security.[6] *See Shermer v. Baker*, 2 Wn. App. 845, 853, 472 P.2d 589 (1970). Mr. Douglass nonetheless had to show that the fraud was not discoverable through the exercise of due diligence until within three years of suit. *See Interlake Porsche*, 45 Wn. App. at 518.

---

[6] RCW 21.20.430(3) provides that every person who "directly or indirectly controls a seller or buyer ... [or who] materially aids in the transaction ... [is liable] jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know ... of the existence of the facts by reason of which the liability is alleged to exist."

Here, Mr. Douglass assumed the project was dead because Mr. Stanger did not tell him otherwise. A reasonable business person would not have made such an assumption. Mr. Douglass could have and should have made an independent inquiry into the status of the project and, necessarily, the property. Had he examined the public records anytime after September 1992, he would have discovered that Mr. Stanger and Mr. Barnes had executed a deed of trust on the property to others.

Mr. Stanger sent Mr. Douglass memos about the progress of the shopping center through 1991. But once Mr. Stanger's memos stopped, and it looked like Mr. Douglass's only recovery would be on the promissory notes, he had a duty to keep himself informed of the status of the property. And this he did not do.

A periodic check of the public records would have alerted him to the fact that Mr. Stanger and Mr. Barnes were continuing the project without him. He did not check the records until he saw a contractor working on the property. And that was more than three years after Mr. Stanger had signed new promissory notes for repayment of Mr. Douglass's investment. This is not due diligence. *See Interlake Porsche*, 45 Wn. App. at 518. Accordingly, we hold that both his cause of action for securities fraud and his claim of common law fraud are beyond the applicable statutes of limitation. RCW 21.20.430(4)(b); RCW 4.16.080(4).

## SUMMARY

We therefore affirm the trial court's summary dismissal of Mr. Douglass's claims of joint venture and apparent agency against Mr. Barnes. We also affirm the trial court's summary dismissal of Mr. Douglass's securities and common law fraud claims based on the statutes of limitation.

KURTZ, C.J., and BROWN, J., concur.